[No. G014894. Fourth Dist., Div. Three. May 31, 1996.]

FRANCINE HERRLE, Plaintiff and Appellant, v.
ESTATE OF HELEN I. MARSHALL, Defendant and Respondent;
CONSTITUTION STATE SERVICE COMPANY, Intervener and
Appellant.

## COUNSEL

Joseph Powell for Plaintiff and Appellant.

Daniel H. Willick as Amicus Curiae on behalf of Plaintiff and Appellant.

Gillette, Loof, Langton & Hagner, Robert C. Kazer and Keith Langton for Intervener and Appellant.

Parker, Stanbury, Babcock, Combs & Bergsten, Parker Stanbury, Richard A. Jones and Dana C. Clark for Defendant and Respondent.

Madory, Zell & Pleiss, Mark G. McGrath, Joan S. Wise, Deborah M. Zuckerman, Bruce B. Vignery, Davis, Samuelson, Blakely & Goldberg and Marjorie G. Fuller as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**RYLAARSDAM, J.**—Francine Herrle sued the Estate of Helen I. Marshall, deceased, under former Probate Code section 707 (see now Prob. Code, §§ 550 et seq. and 9390) to recover damages for personal injuries. She suffered these injuries when she was struck by Marshall, a patient suffering dementia, at the hospital where plaintiff was employed. Constitution State Service Company, the workers' compensation carrier for plaintiff's employer, intervened, seeking recovery for benefits it paid on her behalf. After a bench trial, the court ruled for defendant. We conclude the primary

assumption of the risk doctrine bars recovery under these circumstances and therefore affirm the trial court's judgment.

## FACTS

The case was tried on an agreed statement of facts which included summaries from depositions of plaintiff and several of her coworkers. The evidence is undisputed except that a conflict exists concerning plaintiff's prior knowledge of Marshall's combativeness. As discussed below, and in the light of the holding in *Neighbarger* v. *Irwin Industries, Inc.* (1994) 8 Cal.4th 532 [34 Cal.Rptr.2d 630, 882 P.2d 347] (hereafter *Neighbarger*), plaintiff's actual knowledge of Marshall's propensity to violence is irrelevant to whether her claim is barred as a matter of law by primary assumption of risk, the dispositive issue herein.

Plaintiff worked at a convalescent hospital as a certified nurse's aide. The hospital had many patients suffering from Alzheimer's disease. Violence is a common trait among Alzheimer's patients. Plaintiff knew her job exposed her to patients suffering from mental illnesses which made them violent, combative and aggressive. She also knew of prior instances where aides were struck by patients. Nurse's aides received training in how to approach, handle, place in bed, and restrain patients.

Marshall was a patient suffering from senile dementia and Alzheimer's disease. She was occasionally combative and belligerent. Prior to the incident involving plaintiff, she slapped or hit several other hospital employees. The admitting diagnosis indicated "She can be very combative at times." Likewise, the nursing assessment indicated, ". . . becomes very belligerent at times. High risk for injury."

The incident resulting in plaintiff's claim occurred when Marshall became combative while another nurse's aide was moving her from a chair to a bed. Plaintiff, fearing Marshall would fall to the floor, entered the room to help. While holding Marshall and moving her onto the bed, Marshall struck plaintiff about the head several times causing serious jaw injuries.

## DISCUSSION

### *The Doctrine of Primary Assumption of Risk*

█ As a general rule, persons are liable for injuries they cause others as a result of their failure to use due care. (Civ. Code, § 1714, subd. (a); *Neighbarger, supra,* 8 Cal.4th at p. 536; *Rowland* v. *Christian* (1968) 69

Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) The only exceptions to this rule are those created by statute or clear public policy. (*Neighbarger, supra,* 8 Cal.4th at p. 537; *Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112.)

One such exception is the assumption of the risk doctrine. Although traditionally viewed as a defense to an action for negligence, the modern doctrine of primary assumption of risk involves a situation where defendant does not owe a duty of care to plaintiff. Since such a duty of care is an element of the tort of negligence, such situations should perhaps be described as the absence of negligence. Secondary assumption of risk, on the other hand, is a defense, now merged in comparative negligence, to a negligence cause of action.

In *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], the Supreme Court undertook the task of determining the scope of primary assumption of risk and its relationship to comparative negligence. (See *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].) *Knight* stated: "In cases involving 'primary assumption of risk'—where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine continues to operate as a complete bar to the plaintiff's recovery. In cases involving 'secondary assumption of risk'—where the defendant does owe a duty of care to the plaintiff, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme . . . ." (*Knight* v. *Jewett, supra,* 3 Cal.4th at pp. 314-315.)

■ Here, we have precisely the situation covered under the primary assumption of the risk doctrine. Plaintiff was engaged as an aide in a convalescent hospital to assume responsibility to care for mentally incompetent patients, many of whom are occasionally violent. Marshall was placed specifically in the hospital's care in part to protect her from injuring herself and others because of her violent tendencies. In the words of *Knight,* "the nature of the activity" was the protection of the patient from doing harm to herself or others; "the parties' relationship to the activity" was plaintiff's professional responsibility to provide this protection, the "particular risk of harm that caused the injury" was the very risk plaintiff and her employer were hired to prevent.

*Civil Code Section 41*

Plaintiff argues assumption of risk is not available where defendant is an incompetent because Civil Code section 41 imposes an obligation on mentally incompetent persons to compensate those injured by their tortious acts.

It provides, "A person of unsound mind, of whatever degree, is civilly liable for a wrong done by the person, . . ." Plaintiff argues this statute precludes assertion of an assumption of the risk defense.

The short answer to this argument is that Civil Code section 41 is intended to place the incompetent person in the same posture as the competent person, not in a legally worse position. Where no duty exists in the first place, section 41 does not create one. Competent persons can avail themselves of the doctrine of primary assumption of risk. Likewise the defense is available to the incompetent. Here, plaintiff, by the very nature of her profession, placed herself in a position where she assumed the duty to take care of patients who were potentially violent and to protect such patients from committing acts which might injure others. The danger of violence to the plaintiff was rooted in the " ' " ' "very occasion for [her] engagement." ' " ' " (*Neighbarger, supra*, 8 Cal.4th at p. 540; also see *Walters* v. *Sloan* (1977) 20 Cal.3d 199, 205 [142 Cal.Rptr. 152, 571 P.2d 609]; *Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 369 [99 Cal.Rptr. 29, 491 P.2d 821]; *Giorgi* v. *Pacific Gas & Elec. Co.* (1968) 266 Cal.App.2d 355, 359 [72 Cal.Rptr. 119]; *Krauth* v. *Geller* (1960) 31 N.J. 270 [157 A.2d 129, 131].) This is not a case of a person suffering from senile dementia who gets in a car and causes an accident.

■ Civil Code Section 41 is a codification of the common law. (*Mullen* v. *Bruce* (1959) 168 Cal.App.2d 494, 496 [335 P.2d 945, 77 A.L.R.2d 620].) It is based on several policy considerations. One is that, as between two innocent persons, the one whose act caused the injury should bear the loss. (*Ellis* v. *D'Angelo* (1953) 116 Cal.App.2d 310, 313 [253 P.2d 675].) The rule also avoids difficult evidentiary problems in attempting to estimate the existence and extent of a person's mental deficiency. In addition, imposing liability encourages those responsible for incompetent people to provide care for them so as to avoid injury to others. (*Polmatier* v. *Russ* (1988) 206 Conn. 229, 235-236 [537 A.2d 468, 470]; *Williams* v. *Kearbey* (1989) 13 Kan.App.2d 564, 566 [775 P.2d 670, 672-673]; Rest.2d Torts, § 283B, com. b. at p. 17; *id.*, § 895J, com. a. at pp. 435-436.)

In the context of a stranger injured by an incompetent, this rule presents sound public policy. As between those two persons, the mere fact one caused injury without the requisite intent to commit the act should not absolve that individual. ■ But defendant, through the agency of her relatives, took steps to protect both herself and others from the very injury suffered by plaintiff, by entering a convalescent home which cared for persons who could not control their actions. Plaintiff worked there as a nurse's aide aware of the patients' potential for violence and was trained on how to avoid or

limit the possibility of injury. Extensive litigation over the question of incompetency in this context is unlikely. The institutionalization of a person under these circumstances is strong evidence of the individual's mental incompetency. Furthermore, the caregiver is covered for work-related injuries by workers' compensation.

An earlier California case refused to hold that, as a matter of law, assumption of risk barred an action by an injured attendant for injuries sustained at the hands of an institutionalized person. (*Mullen* v. *Bruce, supra,* 168 Cal.App.2d at pp. 496-498.) *Mullen* held the defense of assumption of risk "was a factual question for the determination of the court." (*Id.* at p. 498.) The case provides a questionable precedent. The type of assumption of risk analyzed in *Mullen* differs from the modern doctrine, as explained in *Neighbarger.* When *Mullen* was decided, assumption of the risk operated as a complete defense to recovery, if a plaintiff voluntarily accepted a known and appreciated risk. (*Gomes* v. *Byrne* (1959) 51 Cal.2d 418, 420 [333 P.2d 754]; *Prescott* v. *Ralph's Grocery Co.* (1954) 42 Cal.2d 158, 161-162 [265 P.2d 904].) Thus, *Mullen* involved what today would be construed as secondary assumption of risk.

The doctrine of primary assumption of risk is not about what the plaintiff knew and when she knew it, or, as the *Neighbarger* court put it, a "plaintiff's subjective, voluntary assumption of a known risk." (*Neighbarger, supra,* 8 Cal.4th at p. 537.) Rather, it is, like the fundamental nature of duty itself in tort law, a legal conclusion based on the relationship between the parties.[1] (Cf., e.g., *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 885 [2 Cal.Rptr.2d 79, 820 P.2d 181] [" ' "[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." [Citation.]' "].) For this reason, we consider *Mullen*'s analysis on the issue of assumption of the risk to be of no assistance.

---

[1] The theme has multiple references in the *Neighbarger* text: "the proper application of the doctrine of assumption of risk, that is, an illustration of when it is appropriate to find that the defendant owes no duty of care" (8 Cal.4th at p. 538); ". . . we examine the case law establishing the rule to discover the policy basis for waiving the usual duty of care . . . ." (*id.* at p. 539); ". . . the policy basis for the firefighter's rule is fairness." (*ibid.*); ". . . we turn now to the question whether the [firefighter's] rule, or the broader doctrine of assumption of risk, should apply to exonerate the defendant from a duty of care. . . ." (*id.* at p. 541); "As we have explained, the proper basis for the firefighter's rule . . . is a legal conclusion . . . ." (*ibid.*); "We also keep in mind . . . the nature of the defendant's activities and the relationship of the plaintiffs and the defendant to that activity to decide whether, as a matter of public policy, the defendant should owe the plaintiffs a duty of care." (*ibid.*); "As we have explained above [assumption of the risk as explained in *Knight* v. *Jewett, supra,* 3 Cal.4th 296] requires a closer analysis, focusing not on the foreseeability of the hazard or the plaintiff's subjective awareness of risk, but on the *defendant's duty of care and the relationship of the parties.*" (8 Cal.4th at p. 545, fn. 4, italics added); and, finally, the court's dispositive close "look" at "defendant's activity and plaintiffs' relationship to it" (*id.* at p. 547).

It is true that the *Mullen* court observed that the defendant's unsound mind made her "a person coming within the provisions" of Civil Code section 41. This did not, however, prevent the court from recognizing the (then prevalent) doctrine of assumption of risk was potentially available as a defense. (*Mullen* v. *Bruce, supra,* 168 Cal.App.2d at p. 498.)

*Recent Cases in Other States*

Two recent Florida decisions and a decision of the Wisconsin Supreme Court have dealt with the same issue which we face here. In *Anicet* v. *Gant* (Fla.Dist.Ct.App. 1991) 580 So.2d 273, the court barred recovery by Gant, a state hospital attendant, injured when he was violently attacked by Anicet, an insane resident. *Anicet* recognized Florida law provides "a lunatic is liable in the same generalized way as is an ordinary person for both 'intentional' acts and 'negligent' ones." (*Id.* at p. 275.) But it noted Gant "was employed to encounter, and knowingly did encounter, just the dangers which injured him" (*id.* at p. 276), while Anicet, "his relatives, and society did as much as they could do . . . by confining him . . . ." (*Ibid.*) Thus, the court concluded, ". . . we revert to the basic rule that where there is no fault, there should be no liability. Since the reasons for the limited exception to this rule which have been adopted as to insane persons do not apply to the present situation, so the exception itself cannot do so." (*Id.* at p. 277.)

*Anicet* discussed and distinguished *Mullen* on ground it applied Civil Code section 41 and there is no equivalent statute in Florida. (*Anicet* v. *Gant, supra,* 580 So.2d at p. 277.) But, as noted, section 41 is merely a codification of the common law rule that insane persons are liable for injuries caused by their tortious acts (*Mullen* v. *Bruce, supra,* 168 Cal.App.2d at p. 496), and Florida follows the common law rule. (*Anicet, supra,* 580 So.2d at p. 277; see also *Kaczer* v. *Marrero* (Fla.Dist.Ct.App. 1976) 324 So.2d 717, 719 [324 So.2d 717]; *Jolley* v. *Powell* (Fla.Dist.Ct.App. 1974) 299 So.2d 647, 649.)

In *Mujica* v. *Turner* (Fla.Dist.Ct.App. 1991) 582 So.2d 24, the same court held a physical therapist could not recover from a nursing home patient suffering from Alzheimer's disease who injured her. Citing *Anicet,* the court held, "[a]lthough we agree that ordinarily a mental incompetent is responsible for his own torts, . . . this rule is inapplicable when the incompetent has been institutionalized, as here, because of her mental incompetency and injures one of her caretakers while in such institution." (*Id.* at p. 25.)

In *Gould* v. *American Family Mut. Ins. Co.* (1996) 198 Wis.2d 450 [543 N.W.2d 282], the Wisconsin Supreme Court examined the common law rule in a case indistinguishable from the one before us. In *Gould,* the family of a

man suffering from Alzheimer's disease was "forced" to admit him to a health care center. He was "often disoriented, resistant to care, and occasionally combative." (*Gould* v. *American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at p. 283.) One day the head nurse of the center's dementia unit attempted to redirect the patient back to his own room after he had gone into another patient's room. He responded by knocking the nurse to the floor. (*Ibid.*) The nurse and her husband sued the patient and his insurer.

The *Gould* court acknowledged that Wisconsin had a rule which functioned like California's Civil Code section 41. "It is a widely accepted rule in most American jurisdictions that mentally disabled adults are held responsible for the torts they commit regardless of their capacity to comprehend their actions . . . ." (*Gould* v. *American Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at p. 284.)

The *Gould* court next confronted the central intellectual problem presented by the common law rule (and California's Civil Code section 41). The rule imposes what is in essence *strict liability* upon an individual where he or she cannot really be said to be at fault. (See *Gould* v. *Family Mut. Ins. Co.*, *supra*, 543 N.W.2d at p. 284 [noting the origins of the rule could be traced back to a 1616 English trespass case when strict liability was the rule]; see also Annot., Civil Liability of Insane or Other Mentally Disordered Person for Assault or Battery (1961) 77 A.L.R.2d 625, 632 [referring to the "medieval conception of liability for acts done, without regard to fault"].) After examining how two prior Wisconsin decisions had dealt with the problem of torts committed by insane persons, and how the intermediate appellate court in the case before it had interpreted those decisions (basically, by disregarding the rule), the court acknowledged that mental impairments "come in infinite types and degrees" and attempting to draw a line creates "difficulties . . . in determining the existence, nature, degree, and effect of a mental disability." (543 N.W.2d at p. 286.)

Even so, the *Gould* court determined that under the limited "circumstances" of the situation before it, the defendant Alzheimer's patient could not be held liable for knocking the nurse to the floor. The nurse was not an "innocent member of the public," but "employed as a caretaker specifically for dementia patients." (543 N.W.2d at p. 286.) She had "express knowledge of the potential danger inherent in dealing with Alzheimer's patients in general and [the defendant] in particular." (543 N.W.2d at p. 287.) The patient's "disorientation and potential for violence is the *very reason he was institutionalized and needed the aid of employed caretakers*." (*Ibid.*, italics added.) Thus, even though "*ordinarily* a mentally disabled person is responsible for his or her torts," the relationship of such a person with an "employed caretaker" reveals an exception to the rule. (*Ibid.*) "[A] person

institutionalized, as here, with a mental disability, and who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to caretakers who are employed for financial compensation." (*Ibid.*)

*Gould* did not mention *Neighbarger*, but its analysis is remarkably congruent with it. *Gould* is an extended commentary on the idea that the basic relationship between the Alzheimer's patient and his employed caretaker "justifies exonerating" the patient "from the usual duty of care." (See *Neighbarger, supra,* 8 Cal.4th at p. 543.)

We find the reasoning of *Anicet, Mujica* and *Gould* persuasive. Like California's primary assumption of the risk doctrine, these decisions are based on the lack of a duty owed by institutionalized mentally incompetent persons towards their employed caretakers. Because of the nature of the activity, caring for the mentally infirm, and the relationship between the parties, patient and caregiver, mentally incompetent patients should not owe a legal duty to protect caregivers from injuries suffered in attending to them. Here, the very basis of the relationship between plaintiff and Marshall was to protect Marshall from harming either herself or others.

*Sound Public Policy Precludes the Imposition of Liability*

Plaintiff has not cited, nor are we aware of, any body of case law which stands for the proposition that health care providers can sue their patients for injuries inherent in the very condition for which treatment was sought. The older cases dealing with injuries done by institutionalized persons to institutional caregivers (*Mullen* v. *Bruce, supra,* 168 Cal.App.2d 494, *Van Vooren* v. *Cook* (1947) 273 A.D. 88 [75 N.Y.S.2d 362] and *McGuire* v. *Almy* (1937) 297 Mass. 323 [8 N.E.2d 760]) do not approach the question of assumption of risk in terms required by the Supreme Court in *Neighbarger*: namely, whether the *relationship* between the injured health care provider and the institutionalized patient defendant was such that public policy should preclude recovery.

When the relationship between health care providers and health care recipients is considered, the idea that a patient should be liable for "conduct" part and parcel of the very disease which prompted the patient (or, as here, the patient's family) to seek professional help in the first place becomes untenable. It is the health care provider, not the patient, who is in the best position to protect against the risks to the provider rooted in the very reason for the treatment. Were we to reach a contrary conclusion, nurses working in an infectious disease unit could sue a patient for giving them tuberculosis.

Were that view to prevail, risks most efficiently allocable to and traditionally borne by the health care industry would be shifted to individual patients and their families. Should patients be forced to purchase separate liability insurance before seeing their doctor or, as in the present case, should children do so when checking an elderly parent into a nursing home?

Furthermore, were we to hold that plaintiff is entitled to recover, the ultimate result would place liability on plaintiff's employer. Since defendant was placed in the hospital for the very purpose of protecting her from doing harm to herself or others, the harm done to plaintiff would derive from the failure of the hospital to carry out its duties to defendant. The hospital assumed the primary duty to protect defendant and those who might be harmed by her. Therefore, should defendant be liable she would be entitled to assert a right to indemnification against the hospital. (See *Herrero* v. *Atkinson* (1964) 227 Cal.App.2d 69 [38 Cal.Rptr. 490]; Rest.2d Torts, § 886B, subd. (2)(f) ["Instances in which indemnity is granted" include "The indemnitor was under a *duty* to the indemnitee *to protect him against the liability* to the third person." (Italics added.)].)

The net result of such circuitous litigation would place the ultimate responsibility to pay for the employee's damages on the shoulders of the employer-hospital. This would leave us with the result that the employer would be deprived of the limitations placed upon its liability under the workers' compensation laws.

*The Neighbarger Case*

Plaintiff argues barring recovery in this case would constitute an impermissible extension of the firefighter's rule. In *Neighbarger,* the Supreme Court refused to apply the firefighter's rule to privately employed industrial safety supervisors who were injured while fighting a fire. (*Neighbarger, supra,* 8 Cal.4th at pp. 541-546.) In so ruling, the court noted "It is certainly not the case . . . that private employees assume all the foreseeable risks of their employment. As we have explained above, *Knight* . . . requires a closer analysis, focusing not on the foreseeability of the hazard or the plaintiff's subjective awareness of risk, but on the defendant's duty of care and the relationship of the parties." (*Id.* at p. 545, fn. 4.)

*Neighbarger* does not hold that primary assumption of risk in an employment context can only be applied to public employees. The court notes, "The firefighter's rule should not be viewed as a separate concept, but as an example of the proper application of the doctrine of assumption of risk, that is, an illustration of when it is appropriate to find that the defendant owes no

duty of care." (*Neighbarger, supra,* 8 Cal.4th at p. 538.) Citing an earlier case (*Giorgi* v. *Pacific Gas & Elec. Co., supra,* 266 Cal.App.2d at pp. 359-360), the court cites as a justification for the application of the doctrine the "public policy precluding recovery for those who are injured by the very hazard they have been employed to confront." (*Neighbarger, supra,* 8 Cal.4th at p. 539.)

The very justifications for the application of primary assumption of risk in case of public firefighters, given by the *Neighbarger* court compel its application herein. The court stressed the relationship between the public, which hires the firefighter, to confront the very risk which supplies the basis for the claim. In doing so, the court notes, based on *Walters* v. *Sloan, supra,* 20 Cal.3d 199 that an analogous situation exists, where "a contractor . . . is hired to remedy a dangerous situation; such a private contractor, as a matter of fairness, should not be heard to complain of the negligence that is the cause of his or her employment." (*Neighbarger, supra,* 8 Cal.4th at p. 542.) So here, plaintiff was hired for the very purpose of preventing the danger which now provides the basis for her suit. Again from *Neighbarger,* ". . . it is unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." (*Ibid.*)

In holding that the firefighter's rule was not to be applied to privately employed industrial safety supervisors and thus permitting them to recover from one negligently causing the fire which injured them, the court notes, "The third party [i.e. the negligent defendant], . . . , has not provided the services of the private safety employee. Nor has the third party paid in any way to be relieved of the duty of care toward such a private employee. Having no relationship with the employee, and not having contracted for his or her services, it would not be unfair to charge the third party with the usual duty of care towards the private safety employee." (*Neighbarger, supra,* 8 Cal.4th at p. 543.) This rationale clearly does not apply here. Defendant, through her relatives, did contract, seek, and need the services of plaintiff. Defendant, through these same relatives, paid to be relieved of a duty of care. Defendant had a relationship of care receiver to caregiver with plaintiff. Therefore it would be unfair to now impose on defendant the very duty of care which she had contracted for plaintiff to supply.

Our decision relies on the relationship between mentally incompetent persons and those responsible for them with the persons who have agreed to care for incompetent persons, and the conduct of those responsible for the incompetent in entrusting their charge to the professional care and control of convalescent hospitals or other similar institutions. Consequently, we conclude *Neighbarger* does not bar application of the assumption of the risk doctrine in this case.

The judgment is affirmed. Defendant shall recover its costs on appeal.

Sills, P. J., concurred.

**WALLIN, J.,** Dissenting.—The majority's decision to apply primary assumption of risk to deny recovery to Francine Herrle relies on a misstatement of the relationship between Herrle and Marshall and ignores modern beliefs and legal requirements concerning the treatment of our most vulnerable elderly citizens. It is both bad law and bad policy.

Francine Herrle was employed as a nurse's aide at a convalescent hospital. Her duties, for which she was paid not much more than minimum wage, included changing bedpans, helping the elderly to and from their beds, and assisting them in feeding and dressing themselves. Some of the many elderly patients at the hospital, including the late Helen Marshall, then 72 years old, suffered from Alzheimer's disease, which causes presenile or senile dementia. Of the patients suffering from Alzheimer's, some experienced periodic outbursts of violence. Marshall's relatives caused her to be admitted to the hospital because her dementia was too advanced for home care, particularly due to episodes of anger and violence toward anyone attempting to help her. Nine days after her admission, a nurse's aide was transferring Marshall from her wheelchair to her bed when Marshall began struggling. The nurse's aide feared she would drop Marshall and called out for assistance. Herrle, responding to this emergency, rushed into the room, wrapped her arms around Marshall, and put her into bed. As she was being moved, Marshall repeatedly struck Herrle with both fists, causing severe and permanent injuries to both jaw joints. Herrle has undergone three surgeries and most likely will require total jaw joint replacement in the future. The parties stipulated Herrle's damages exceeded the $200,000 limit of Marshall's homeowners policy, but agreed to limit any recovery to that amount.

After a court trial, primarily on stipulated facts, the trial judge ruled that "the injury was caused by a hazard inherent in the employment relationship [and falls] within the category of the *primary assumption of risk*—or stated conversely, that *there was no duty owed*—and that the court is bound to follow [*Nelson* v. *Hall* (1985) 165 Cal.App.3d 709 (211 Cal.Rptr. 668)] and adopts the logic and phraseology of the Florida cases . . . ." (Italics added.) Judgment was entered in favor of Marshall.

My colleagues hold that primary assumption of risk, a doctrine previously applied in this state to public safety employees, participants in athletic events, and veterinarians treating animals, also extends to private, convalescent home employees engaged in caring for our most vulnerable elderly citizens. I cannot agree.

After *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], primary assumption of risk acts as a complete bar to a plaintiff's recovery. The doctrine focuses on whether a defendant owes a plaintiff a duty of care. In making this determination, courts must look to the nature of the activity and the relationship of the parties to see if public policy supports finding no duty. (*Neighbarger* v. *Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 541 [34 Cal.Rptr.2d 630, 882 P.2d 347]; *Knight* v. *Jewett, supra,* 3 Cal.4th at pp. 314-315.) In a few, very limited circumstances where a defendant has contracted for a plaintiff's services and the plaintiff is injured by the *very reason* necessitating his or her employment, no duty is owed, and the plaintiff is barred from recovery.[1] (*Neighbarger, supra,* 8 Cal.4th at pp. 541-542.) To illustrate this point, *Neighbarger* cited the following examples: (1) a contractor hired to remedy a dangerous situation cannot recover when injured by the very danger he or she is hired to fix; (2) a public firefighter hired to fight fires is barred from recovering when injured by the very fire he or she is called to extinguish; and (3) a veterinarian hired to treat an animal cannot recover if bitten by it.[2] (8 Cal.4th at pp. 541, 542, 545.)

*Neighbarger* also cited *Anicet* v. *Gant* (Fla.Dist.Ct.App. 1991) 580 So.2d 273, as an example. (*Neighbarger* v. *Irwin Industries, Inc., supra,* 8 Cal.4th at p. 542.) The patient in *Anicet* was committed to a special ward in a state hospital for insane and violent persons. Gant was a state hospital attendant employed as a unit treatment specialist assigned to care only for patients confined to this special ward. "His duties *specifically* included the treatment and, if possible, *the control* of patients like Anicet, of whose dangerous tendencies he was well aware." (*Anicet, supra,* 580 So.2d at p. 274, italics added.) The *very reason* for Gant's employment was to handle violent and insane patients, and Anicet had contracted for the plaintiff's services by virtue of being a member of the public which employed plaintiff. (*Ibid.*)

In attempting to avoid *Neighbarger*'s holding limiting assumption of the risk, the majority relies entirely on *Anicet* and two similar cases from other

---

[1]Contrary to the majority's and trial judge's assertions, the test for applying primary assumption of risk does not rest on whether a hazard is inherent in an employee's occupation. (*Neighbarger* v. *Irwin Industries, Inc., supra,* 8 Cal.4th at pp. 536, 545, fn. 4 ["It is certainly not the case . . . that private employees assume all the foreseeable risks of their employment."].)

[2]In entering judgment in favor of Marshall, the trial judge relied on *Nelson* v. *Hall* (1985) 165 Cal.App.3d 709 [211 Cal.Rptr. 668] which involved a claim by a veterinarian's assistant bitten while treating the defendant's dog. The care of humans, however, cannot be compared to the care of animals. There is always a risk of being bitten by a dog, and veterinarians are in the best position to protect against injury. They can use cages, restraints, muzzles, leashes, choke chains, whips, cross-ties, tranquilizer darts, and even deadly force to safeguard themselves from injury by an animal. None of these measures are appropriate, to say the least, in the care, treatment, and safeguarding of mentally incompetent elderly patients. In fact, all of them, with the possible exception of appropriately prescribed tranquilizers, are horrifying in modern society and would constitute elder abuse. (Welf. & Inst. Code, § 15600 et seq.)

jurisdictions. The majority states " 'the nature of the activity' was the protection of [Marshall] from doing harm to herself or others; 'the parties' relationship to the activity' was [Herrle's] professional responsibility to provide this protection, the 'particular risk of harm that caused the injury' was the very risk [Herrle] and her employer were hired to prevent." (Maj. opn., *ante*, at pp. 1765 and 1770.) While this may be true of the relationship between the patient and the plaintiff in *Anicet*, it is not true of the relationship between Herrle and Marshall.

Herrle was hired as a nurse's aide in a private convalescent hospital and was charged with caring for elderly patients in general (i.e., changing bedpans and linens, and dressing and feeding patients). Contrary to my colleagues' assertions, she was not hired for the *sole* purpose of preventing potentially violent Alzheimer's patients from injuring themselves and others. Additionally, the mere fact that a family contracts with a private convalescent hospital to care for an incompetent family member should not bar *every* employee who may come into contact with the patient, regardless of how remote the contact may be, from recovering for injuries the patient may inflict. Just as in *Neighbarger,* where fighting fires was incidental to the safety supervisors' overall job duties, occasionally caring for violent Alzheimer's patients was incidental to Herrle's overall duty of caring for elderly patients. Under neither circumstance should primary assumption of risk bar recovery for injuries *incidental* to employment.

As its principal support for applying primary assumption of risk to the present case, the majority cites two additional out-of-state cases, *Mujica* v. *Turner* (Fla.Dist.Ct.App. 1991) 582 So.2d 24, and *Gould* v. *American Family Mut. Ins. Co.* (1996) 198 Wis.2d 450 [543 N.W.2d 282]. *Mujica* simply followed *Anicet* without discussing the rule. Mujica was a physical therapist in charge of the daily living activity program for Alzheimer's patients at a nursing home. She was denied recovery for injuries sustained when a patient shoved her, causing her to fall. Unlike Herrle, the plaintiff in *Mujica* was specifically hired to care for Alzheimer's patients (i.e., it was the *very reason* for the physical therapist's employment). Additionally, the plaintiff was injured by one of her own patients.

The same is true for the plaintiff in *Gould.* There, the plaintiff was the head nurse of a secured dementia unit in a restricted health care center, who sustained injuries when one of her own patients knocked her to the floor. (*Gould* v. *American Family Mut. Ins. Co., supra,* 543 N.W.2d at pp. 283, 287.) Again, as with the physical therapist in *Mujica,* working directly with the Alzheimer's patient who injured her was the *very reason* for her employment.

Herrle's situation is much different from the plaintiffs in *Mujica* and *Gould*. Not only was Herrle hired to care for elderly patients in general, but Marshall was not even one of her patients. Thus, the majority is incorrect in stating, ". . . the very basis of the relationship between [Herrle] and Marshall was to protect Marshall from harming either herself or others." (Maj. opn., *ante*, at p. 1770.) Herrle had never cared for Marshall before the incident and was merely coming to the assistance of another nurse's aide when she was injured.

The majority's strained application of primary assumption of risk to these facts is also contrary to the decision in *Mullen* v. *Bruce* (1959) 168 Cal.App.2d 494 [335 P.2d 945, 77 A.L.R.2d 620]. Mullen was a registered nurse employed on an independent contractor basis with a sanitarium. One evening, she was hired to care for Bruce, who was being treated for alcoholism. Bruce's symptoms included delirium tremens, and Mullen was told that Bruce was violent and unmanageable. During the night, Bruce, dressed in a nightgown and irrational, tried to leave the sanitarium. While attempting to return her to her bed, Mullen suffered severe arm and shoulder fractures. The Court of Appeal rejected Bruce's contention that Mullen assumed the risk of injury when she accepted the nursing assignment, finding implicitly that the patient owed Mullen a duty of care.[3]

Applying the *Neighbarger* test, the relationship between Mullen and Bruce was much closer than the relationship between Herrle and Marshall. As an independent contractor, Mullen was specifically hired to care for the very patient who injured her. Herrle was a hospital employee involved in the care of many different patients; Marshall was not one of them.

Recent California cases on assumption of risk support Herrle's contention that the doctrine should not be applied to bar her recovery. To date, the doctrine has been applied in this state in only limited circumstances. Participants in sporting activities have been found to assume the risk of injuries normally incident to the game. (*Knight* v. *Jewett*, *supra*, 3 Cal.4th 296 [touch football]; *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] [water-skiing]; *Connelly* v. *Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855] [snow skiing]; *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [38 Cal.Rptr.2d 65] [white-water rafting];

---

[3]The majority finds *Mullen* inapplicable because it was decided when assumption of risk operated as a complete bar to recovery if a plaintiff voluntarily accepted a known and appreciated risk. The majority reasons, since this type of assumption of risk now falls under the heading of secondary assumption of risk, and the present case deals with primary assumption of risk, *Mullen*'s analysis is of no assistance. Yet, in order to apply secondary assumption of risk, a court must conclude a duty is owed to the plaintiff in the first instance. By finding Mullen could recover, the court implicitly found Bruce owed Mullen a duty.

*O'Donoghue* v. *Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188 [35 Cal.Rptr.2d 467] [snow skiing]; *Harrold* v. *Rolling J Ranch* (1993) 19 Cal.App.4th 578 [23 Cal.Rptr.2d 671] [horseback riding]; *Stimson* v. *Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670] [sailing].) Additionally, because their primary activity is responding to hazardous situations and they receive special compensation[4] for confronting the dangers of their occupation, firefighters also have been held to assume the risk of injury.[5] (*Walters* v. *Sloan* (1977) 20 Cal.3d 199 [142 Cal.Rptr. 152, 571 P.2d 609]; see also *Hubbard* v. *Boelt* (1980) 28 Cal.3d 480 [169 Cal.Rptr. 706, 620 P.2d 156] [applying assumption of risk for the same reasons to a police officer injured in a high-speed chase].)

Attempts to broaden the application of the doctrine to other employment contexts have been uniformly rejected. Assumption of risk does not extend to a private safety employee whose duties include firefighting, in part because he or she does not receive the special pay or disability and retirement benefits of a public firefighter. (*Neighbarger* v. *Irwin Industries, Inc., supra*, 8 Cal.4th at p. 532.) Similarly, private tow truck drivers and ambulance attendants do not assume the risk of injuries incident to their occupation. (*Id.* at pp. 545-546.) Neither do private security guards injured during patrol. (*Marquez* v. *Mainframe* (1996) 42 Cal.App.4th 881 [50 Cal.Rptr.2d 34].) Despite Herrle's misfortune, taking care of the elderly is far less dangerous.

Contrary to the majority's assertions, Marshall's duty towards Herrle does not depend on the applicability of Civil Code section 41. The general rule is that persons are liable for injuries they cause others as a result of their failure to use due care (Civ. Code, § 1714, subd. (a); *Neighbarger* v. *Irwin Industries, Inc., supra*, 8 Cal.4th at p. 536; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561]), and the only exceptions to this rule are those created by statute or clear public policy (*Neighbarger, supra*, 8 Cal.4th at p. 537; *Rowland, supra*, 69 Cal.2d at p. 112). Thus, the majority's statement that "Where no duty exists in the first place, section 41

[4]There is nothing "special" about Herrle's compensation. She is paid $6.75 an hour.

[5]Another policy reason given for barring a public firefighter's recovery is that the firefighter is covered for economic losses by workers' compensation. The majority applies this same policy reason in the present case. (Maj. opn., *ante*, at pp. 1771-1772.) *Neighbarger*, however, soundly rejected using availability of worker's compensation as a policy reason where the injured party is employed by the *private* sector. (*Neighbarger* v. *Irwin Industries, Inc., supra*, 8 Cal.4th at p. 543 [Whenever a public employee is injured, ". . . the public will pay the bill, whether the [employee] is compensated by public benefits derived from taxation, or from insurance proceeds that must be purchased. [Citation.] Our concern to relieve various public agencies of the burden of lawsuits over rights of subrogation that are pointless because the public fisc ultimately pays regardless of the outcome does not apply in the case of *private* . . . employees." (Italics added.)].)

does not create one" (maj. opn., *ante*, at p. 1766), is inaccurate; a duty always exists unless negated by statute or clear public policy. Section 41 does not create a duty, it simply codifies the Legislature's intent that incompetence not be recognized in this state as an exception to the general rule (i.e., it prohibits an incompetent from raising incompetence as a defense). Thus, although Marshall can raise primary assumption of risk as a defense, she cannot use her incompetence as a policy reason supporting application of the doctrine.

Public policy supports finding liability in this case. As the California Psychiatric Association[6] states in its amicus curiae brief supporting Herrle, "[H]ad Ms. Herrle known that the trial court would apply the doctrine of primary assumption of the risk to rule categorically that she could not recover from the patient's liability insurer for any injuries she suffered in coming to the patient's aid, she might have taken the safer course of not intervening to protect the patient and the other health care provider who was endangered by the patient. As a result of the trial court's [and the majority's] ruling, it will be much more likely that caregivers will use impersonal mechanisms, such as seclusion and restraint, to control patients and, thereby protect themselves at the expense of more humane treatment for the patients. This result is antithetical to good patient care."

Nevertheless, the majority suggests that "public policy" requires that Herrle and other caregivers suffer the consequences so that those who caused them harm can avoid financial responsibility. To support this notion, the majority uses farfetched examples. No court has ever suggested that the accidental transmission of an infectious disease from a patient to a health care worker can lead to liability. But patients who assault their caregivers are hardly in the same position. Is the majority suggesting the status of a patient immunizes an individual from assaultive behavior so long as the victim is a healthcare worker?

Finally, the majority even suggests that a patient should be immune—and presumably the hospital responsible—if the patient assaults a visitor or another patient because "[t]he hospital assumed the primary duty to protect [its patient] and those who might be harmed by [him or] her." (Maj. opn., *ante*, at p. 1771.) To hold the patient liable for assaultive conduct would, they suggest, in perhaps the most farfetched argument of the majority opinion, entitle the patient "to assert a right to indemnification against the hospital." (*Ibid.*) But no case has ever suggested that a patient who commits an assault can shift the financial responsibility to the hospital caring for him or her.

---

[6]The association is an organization composed of 3,800 California psychiatrists.

Additionally, in most instances, patients such as Marshall can insure against the types of injuries Herrle suffered. The only option for caregivers such as Herrle, on the other hand, is to change professions or provide less compassionate care. Our most vulnerable elderly citizens deserve legal rules that encourage the best possible care; so do their caregivers.

Finally, the majority apparently concludes that mere proof that a patient suffers from Alzheimer's disease and is occasionally combative justifies application of the doctrine of primary assumption of risk. This insulates all such persons from liability to health care workers they assault. But Alzheimer's disease is a progressive condition. Many patients function quite well. They visit with friends and family, play golf or swim, and even hold jobs. A diagnosis of Alzheimer's disease is simply not a sufficient reason to insulate them from liability to victims of their tortious conduct.

If the majority's view survives, the next time Herrle and others caring for our elderly see an Alzheimer's patient attacking another patient, visitor or caregiver, they would be well advised to use greater force on the patient to avoid injury to themselves. Herrle's successful effort to carefully return Marshall to her bed without injuring the patient has resulted in a lifetime of suffering. Herrle will continue to suffer, but so will the care provided to the ever increasing number of elderly patients.

I would reverse the judgment. Since no other defense is suggested by the parties, I would order judgment for the plaintiff for $200,000.

The petitions of all appellants for review by the Supreme Court were denied September 4, 1996. Mosk, J., was of the opinion that the petitions should be granted.