[No. G033470. Fourth Dist., Div. Three. June 28, 2005.]

DONALD TILLEY, Plaintiff and Appellant, v.
CZ MASTER ASSOCIATION, Defendant and Respondent.

COUNSEL

Law Offices of Thomas A. Hawbaker and Thomas A. Hawbaker for Plaintiff and Appellant.

Berger Kahn and William S. Yee for Defendant and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—Donald Tilley, a security guard employed by BonaFide Security Services, Inc., sued CZ Master Association, a homeowners association which had contracted with BonaFide for security services, because of injuries he suffered from an assault while responding to a complaint about a youth party on CZ's premises. In essence, Tilley argued that CZ owed the security guards a duty to provide a safe premises for them to guard, including imposing restrictions to control youth parties, that it acted

negligently by failing to do so, and that it increased the danger to the guards by requiring them to work unarmed and to respond personally to complaints about such parties.

The trial court granted summary judgment in CZ's favor, concluding: (1) CZ had no liability for the injuries suffered by the employee of an independent contractor (BonaFide) which it hired to perform work on its premises, pursuant to *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721]; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504]; and *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081]; (2) CZ owed Tilley no duty to restrict access to the community's premises; and (3) Tilley had assumed the risk of the injuries he suffered. We conclude the judgment must be affirmed.

The undisputed evidence in this case demonstrates CZ neither required nor expected its unarmed security personnel to confront potentially violent persons, or otherwise to place themselves in danger, and did nothing to alter the basic scope of its security guards' "observe and report" responsibilities. It thus cannot be held liable for the consequences of Tilley's decision to take action beyond the scope of his duties. Moreover, based upon the record in this case, CZ owed its security guards no duty to restrict or curtail youth parties within its premises. But even assuming CZ had such a duty, its failure to take affirmative steps to restrict or control juvenile parties within its property, cannot be construed as having "affirmatively contributed to the employee's injuries" for purposes of the peculiar risk doctrine. (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at p. 202, italics omitted.)

And even assuming CZ were somehow responsible for requiring security guards such as Tilley to confront and attempt to detain violent wrongdoers, such a task must be considered a normal part of the job for which BonaFide (and Tilley) was hired. As such, BonaFide's employees would have expressly assumed the risk of such a danger, and CZ consequently had no duty to protect them from it.

Finally we reject Tilley's contention the court abused its discretion in denying his ex parte application for a last-minute continuance of the hearing. The application did not comply with the timing requirement of Code of Civil Procedure section 437c, subdivision (h), and the court had no obligation to grant it. Because the case had been pending for four years, and two continuances of the hearing had already been allowed, we cannot say the court's denial of an additional continuance was an abuse of its discretion. The judgment is affirmed.

* * *

The assault on Tilley, which is at the heart of this case, occurred in August of 1998. At that time, Tilley was a 62-year-old former law enforcement officer, employed as a security guard by BonaFide.[1] BonaFide had contracted with CZ to provide security for Coto de Caza, a private, gate-guarded community (Coto), and Tilley had been assigned to work there since at least 1996.

The circumstances surrounding Tilley's assault are undisputed. Ashley S., a 17-year-old resident of Coto, had a party. Substantially more guests attended her party than had been directly invited. The party got out of hand, and both Coto's security officers and the Orange County Sheriff's deputies were called. The party was broken up, and most of the guests dispersed. Unfortunately, they did not all stay dispersed.

One of the guests who returned was Robbie Carreno. He had earlier been assaulted by some other partygoers, and he returned to the S. residence with his brother, Nathan, intending to locate his assailants and perhaps retaliate.[2] Robbie and Nathan located one of the perpetrators of Robbie's assault, and attacked him.

Meanwhile, Coto security personnel again received complaints about the goings-on at the S. residence. When Tilley, along with another security officer, returned to the residence, 20 to 30 people remained in and around it.[3] Nathan and Robbie Carreno, however, were already in Nathan's truck, preparing to leave. Tilley approached them, and informed Nathan he was "under arrest." Tilley then asked Nathan for his keys, and obtained them. As Tilley moved away from the truck, Nathan and Robbie came after him and assaulted him in an attempt to regain the keys. Tilley was severely injured in the assault, including a fractured skull. Deputies from the sheriff's department arrived after the assault.

---

[1] According to Tilley's testimony, he had been previously employed as a full-time deputy by the San Bernardino County Sheriff's Department, and as a patrolman by the Adelanto Police Department. He remained an active reserve officer for the San Bernardino County Sheriff's Department at the time of his assault.

[2] According to Nathan Carreno, it was common for young partygoers in Coto to disperse when requested to do so by law enforcement, and then simply drive around for 15 or 20 minutes until the officers were gone, before reassembling at the party. A word to the wise.

[3] Tilley suggests the number might have been greater, but offers only the testimony of a sheriff's deputy who arrived after Tilley's assault. That deputy described the situation when he arrived as a "melee," but did not offer any estimate of the number of people involved. At a later point in his deposition, that same deputy questioned the suggestion the party had been "resurrected," noting "[t]here was just a few people staying around that were helping clean up. The party continued a little bit with them."

Tilley obtained workers' compensation benefits from BonaFide on account of his injuries, and sued CZ, along with several other individuals and entities he alleged were responsible for the incident.[4] He resolved his claims against all named defendants other than CZ.

According to Tilley's third amended complaint, "the primary function of BonaFide under its contract with CZ Master Association was to protect the privacy of the residents of Coto de Caza, by attempting to monitor and control traffic proceeding through the gates for Coto de Caza, [with] the goal of preventing entry by uninvited persons; . . . CZ Master Association contracted with BonaFide to proved a roving patrol to monitor and report to CZ Master Association the violation of the rules and regulations issued by CZ Master Association relating to pets, parking, landscaping, signage, holiday decoration, and the like; . . . Bona Fide personnel, to the extent they observed nuisances, disturbances, suspicious and/or criminal acts were to make a record and report such incidents and activities to CZ Master Association for further action, and call for local law enforcement; . . . the contract between CZ Master Association and BonaFide expressly forbade BonaFide personnel from carrying firearms in the performance of their employment obligations; . . . BonaFide personnel were not required nor expected to perform arrests or confront lawbreakers as part of their regular employment duties . . . CZ Master Association made clear to BonaFide and its personnel that they did not have the authority, power or right to comport themselves or otherwise act as law enforcement officials in the performance of their employment duties and/or their interaction with the community. In a word, CZ Master Association originally retained BonaFide to man the gates and provide courtesy patrols, not perform law enforcement functions."

Tilley also alleges that by the time of his injury in August of 1998, Coto already had a long-standing problem with frequent and uncontrolled youth parties, many of which erupted into violence. He specifically alleges that the S. family, which hosted the party at which he was injured, had previously held summer parties in 1996 and 1997, both of which had spiraled out of control, including numerous uninvited guests, excessive drinking, and violence. There is evidence that Ashley's father, Richard S., was arrested at the 1996 party for allowing minors to consume alcohol at his residence. Tilley himself responded to complaints about the S.'s 1997 party, and found the S.'s other daughter, Torri, involved in a physical altercation with John Jesme, a young male resident of Coto. Tilley intervened on her behalf, and was struck

---

[4] The other defendants included the Carrenos, the S.'s, the property management company hired by CZ, and a subsidiary homeowners association which governed the specific area of Coto in which the S.'s resided.

by Jesme. That incident was the only one involving violence against any security guard in connection with a youth party prior to the incident at issue in this case.

Tilley alleged that CZ was aware of the many problems caused by out-of-control youth parties in Coto, and had authority to impose reasonable restrictions on the number of guests allowed, and to impose greater restrictions on access to the association's property. He also alleged CZ was aware of two nonparty incidents in which young males had "savagely" attacked adult males who had attempted to curtail the youths' conduct within the association property, shortly prior to the S.'s 1998 party. He alleged that CZ "unreasonably increased the risk of harm to BonaFide personnel by instructing them to respond to reports of disturbances, instead of leaving such matters for law enforcement, and without instructing, training or equipping BonaFide personnel to handle such matters."

Tilley's complaint asserted three causes of action against CZ. The first cause of action, negligence, was based upon CZ's alleged failure to take reasonable steps to deter or prevent the S.'s from hosting out-of-control youth parties, and its requirement that security personnel "respond to reports of such parties, as opposed to instructing them to leave such matters to local law enforcement, while at the same time, forbidding [them] to carry firearms to pr[o]tect themselves, and by failing and refusing to provide [security] personnel with the training and equipment necessary to engage in crowd control/dispersal and otherwise deal with violent assailants."

The second cause of action, "negligent supervision of contract" alleged that CZ retained control over the details of BonaFide's work and contract performance, and that it failed to take steps to curtail out-of-control youth parties, or to provide for routine law enforcement patrols of the community, despite its knowledge that such parties posed an unnecessary and unreasonable risk of harm to the security guards. CZ was also faulted for refusing "to permit the security guards to arm themselves, while at the same time failing to establish any policies whatsoever as to whether and how the guards should respond to violent disturbances . . . ," and for increasing the risk to the guards by "insisting that the guards respond to reports of such disturbances in person, without providing any further instruction or guidance . . . as to how or what the guards were supposed to do with respect to such disturbances." According to this cause of action, CZ allegedly expected its unarmed guards to "act, in effect, as a local law enforcement agency, when [they] were neither qualified nor trained nor equipped nor hired to perform such tasks." CZ "specifically preferred to put the guards at risk—rather than have . . . members of the two homeowners associations incur the social and legal ramifications of prompt police involvement . . . ."

Tilley's third cause of action against CZ was for premises liability, and asserted that CZ's failure to prevent or restrict parties and its requirement that the security personnel respond to out-of-control parties constituted a failure to "exercise reasonable care in the ownership, management, maintenance and operation of said premises."[5]

CZ moved for summary judgment, arguing that it owed Tilley no duty to provide a secure premises, that any duty it had was discharged by hiring BonaFide, that Tilley's injury was not foreseeable, that no causal connection existed between its alleged negligence and Tilley's injury, that the elements of premises liability could not be established, and that Tilley's claim was barred by the firefighter's rule, the primary assumption of risk doctrine, and the *Privette* doctrine.[6]

In support of its motion, CZ claimed the following as undisputed facts: (1) "Plaintiff Donald Tilley was designated as BonaFide Security's Special Officer for Coto and assigned a Captain's rank. Captain Tilley supervised BonaFide Security's patrol officers at Coto as Special Officer, and the gate guards for a time as senior Post Commander—a total of 10 officers per shift on Friday and Saturday nights." (Fact No. 9.); (2) "CZ relied on BonaFide and its officers to use their judgment and discretion in carrying out security-related procedures. CZ relied upon BonaFide's policy for each officer to observe and report incidents and violations of law, rather than get in harm's way." (Fact No. 5); (3) "BonaFide Security set the patrol routes and times, created security procedures, approved Security post orders and directives, trained and assigned officers, instructed its officers how to respond to parties and otherwise controlled the day-to-day operations of security for CZ within Coto. Individual officers used their discretion in determining whether to contact law enforcement or residents and visitors in responding to disturbances." (Fact No. 6); (4) "Neither Merit nor CZ ever instructed plaintiff/BonaFide to carry out arrests or detentions" (Fact No. 7); (5) "BonaFide guards were to use their discretion and call law enforcement if they felt unsafe responding to calls about parties." (Fact No. 8); (6) "CZ did not have rules or regulations addressing parties or gatherings at the home-owners' homes. The CC&R's for CZ did not address parties at members'

---

[5] Tilley's complaint recites that it also states a "claim sounding in . . . negligent failure to warn," but it does not. The only allegation pertaining to such a claim is in paragraph 82, which states in pertinent part "Mr. Tilley further alleges that the CZ Master and/or RCA members who called the guardhouse to request Mr. Tilley's second appearance at the [S.] Residence negligently failed to warn of the dangerous conduct and propensities of the Carrenos, either as part of the initial telephone calls or after Mr. Tilley's arrival. . . . [T]o the extent permitted by law, Mr. Tilley alleges and imputes this negligent failure to warn against to . . . CZ Master." That allegation, stated in incomplete and conditional terms, does not state any cause of action.

[6] *Privette v. Superior Court, supra,* 5 Cal.4th 689.

homes." (Fact No. 11); (7) "Merit and CZ did not know in advance of parties by various homeowners. Homeowners gave lists of guests to BonaFide Security to admit guests for parties, but those guest lists were not sent to Merit or CZ in advance." (Fact No. 13); (8) "Plaintiff created and maintained summaries of incidents at Coto between November of 1996 and July 1998 at BonaFide account manager Scott Myers' request. None of the incidents documented by plaintiff involved fighting, violence or underage drinking at homeowner parties. Plaintiff did note over 30 arrests, including 3 separate incidents where plaintiff was assaulted in situations not involving parties." (Fact No. 17); (9) "Neither Robbie Carreno nor Nathan Carreno had ever come to the notice of plaintiff, BonaFide Security, Merit or CZ." (Fact No. 15.)

The parties stipulated to continue the summary judgment motion from June 27, 2003, to August 22, 2003. On July 29, 2003, Tilley filed an unopposed ex parte application to continue the hearing yet again, on the ground he needed additional time to complete "certain third-party custodian of record depositions." That request was granted, and the hearing was continued to September 26, 2003.

Tilley filed his opposition papers on September 16 and 17, 2003, which was untimely. He attributed the delay to computer problems. His opposition included a response to the separate statement which is all but incomprehensible. Rather than merely responding to each fact with "undisputed," or "disputed" followed by evidence demonstrating the dispute, and then a list of additional material facts supported by evidence (see Cal. Rules of Court, rule 342(h)), Tilley responded to each alleged fact with a combination of arguments, objections, factual allegations and questions about whether the evidence cited by CZ really means what it says. For example, Tilley's response to CZ's claimed undisputed Fact No. 5, standing alone, comprises over six full pages. His assertion that the fact is actually disputed is not revealed until after five pages of arguments.[7] Such a response accomplishes little more than obfuscation—a goal which may be prized by those opposing summary judgment, but which should not be countenanced.[8]

Once the wheat of Tilley's response to the separate statement is separated from its considerable chaff, it turns out that the facts stated above from CZ's

---

[7] Technically, Tilley's response initially concedes that Fact No. 5 is undisputed, stating: "First, even if these facts were undisputed (*which they are*) . . . ." (Italics added.) We presume, in light of the claimed evidentiary disputes which are urged five pages later in the document, that the initial statement is a typographical error.

[8] To be fair, we must also point out that CZ's separate statement has the unfortunate tendency to combine several facts into each alleged "undisputed fact." That also significantly increases the complexity of determining which facts are disputed.

motion are largely undisputed. With respect to Fact No. 5, (i.e., "CZ relied on BonaFide and its officers to use their judgment and discretion in carrying out security related procedures [and on] BonaFide's policy for each officer to observe and report incidents and violations of law, rather than get in harm's way"), Tilley offers only evidence that CZ had complained to BonaFide on one occasion that its officers had ignored resident complaints about a "noise disturbance" at the "Jesme" residence (described as "several teenagers being loud and boisterous very late in the evening"), and that there appeared to be a recurring problem of BonaFide officers ignoring complaints about the Jesmes. According to the letter, BonaFide gate attendants had informed residents in the past *that they could not locate the Jesme residence to patrol it.* That letter does not signal any change in policy about juvenile parties in general. Instead, it appears to be focused on the Jesme residence in particular, and the concern that the guards are ignoring it. Tilley also relies upon evidence that one of BonaFide's "post orders" stated that "[p]atrol of the property is to be aggressive, providing a feeling of omnipresence to the residents . . . ." Again, however, that order in no way suggests the officers should put themselves in harm's way. It merely suggests the officers are expected to "see what is going on in the immediate patrol area and . . . to be seen." It also makes clear that "[w]hen interaction is necessary with residents or guest, the greatest weapon an officer has is the quality of verbal delivery; *remain non-aggressive, professional and courteous.*" (Italics added.)

With respect to Fact No. 7, (i.e., "Neither Merit no[r] CZ ever instructed plaintiff/BonaFide to carry out arrests or detentions"), Tilley merely responds that CZ knew or should have known that BonaFide officers sometimes did so, and thus must have impliedly encouraged it. However, the evidence he cites for the "knew or should have known" assertion establishes only that Tilley prepared a list of such incidents for Scott Myers, the BonaFide account representative, but not that the list was transmitted to CZ. In any event, the fact CZ may have known that BonaFide guards sometimes exercised their judgment to detain suspected wrongdoers, presumably when they felt it was safe to do so, does not equate to CZ itself imposing some change in policy.

Finally, Fact No. 17, (i.e., "Plaintiff created and maintained summaries of incidents at Coto between November of 1996 and July 1998 at BonaFide account manager [Scott Myers] request. None of the incidents documented by plaintiff involved fighting, violence or underage drinking at homeowner parties. . . .") while not actually disputed by Tilley,[9] is not entirely correct. The evidence cited actually does include Tilley's report of the assault perpetrated on Tilley by a young male resident of Coto at the S.'s 1997 party.

---

[9] Rather than disputing the evidence, Tilley incorrectly asserts the evidence "pre-date[s] the 1997 and 1998 assaults on Mr. Tilley at the [S.] residence."

In that report, Tilley described an "extremely large youth party *with* more then [*sic*] enough parents/adults supervising. John Jesme attempted to enter the party area and was instructed to leave. He refused and grabbed the 16 yr old hostes [*sic*] by the neck throwing her to the ground. When I attempted to help he struck me in the face with a closed fist. I struck him back and pulled him off the girl and arrested him."

Tilley also testified that the incident with Jesme was the only time he could remember responding to a complaint about fighting in connection with a youth party. The primary problems for which the security guards were summoned to parties were excessive noise, overcrowding, and parking violations. If the problem was overcrowding alone, he would do nothing other than file a report. If the problem was noise, Tilley would knock on the homeowner's door and ask that the noise be reduced or the party ended. If that was not successful, he had been instructed by BonaFide to "call the Orange County Sheriffs." Tilley testified that he understood his only responsibility in connection with youth parties was to "observe and report."

On September 25, 2003, one day prior to the hearing on the summary judgment motion, Tilley made an ex parte application for yet another continuance of the hearing. He argued that he needed additional time to complete a deposition of CZ's custodian of records. He also stated he wished to seek leave to amend his complaint to add a claim based upon an alleged relationship of "special employment" between himself and CZ—an issue which he had claimed in his opposition created a triable issue of fact, precluding summary judgment. CZ opposed the continuance, and it was denied.

After hearing argument, the court granted the summary judgment motion. It first explained its treatment of the evidence: "the Court has noted and considered all of the many evidentiary objections, some of which go to the weight of the evidence, rather than to its admissibility. Although the Court declines to issue formal rulings on such objections, the court has disregarded inadmissible evidence. *See, BILJAC Associates v. First Interstate Bank*, 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819] (1990.)"

The court then turned to the merits: "the Court is persuaded that Plaintiff's claims fail under the doctrine explained in *Hooker v. Department of Transportation*, 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (2002), *Privette v. Superior Court*, 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (1993), and *Toland v. Sunland Housing Group, Inc.* 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504] (1998). Those cases stand for the principle that, except in limited circumstances, an employee of a contractor may not sue the hirer of the contractor under tort theories. The limited circumstances,

recognized in *Hooker*, occur when the hirer retains control over the contractor's performance in such a manner as to 'affirmatively contribute' to the employee's injury. Thus, the issue here is whether or not there is a triable issue of fact as to whether CZ Master retained control of BFSS's work and, in so doing, affirmatively contributed to the injury suffered by Plaintiff. [¶] . . . Based upon the evidence presented in connection with this motion, the court finds that no reasonable trier of fact could [conclude] that CZ Master in any way affirmatively contributed to this incident. Plaintiff points only to Defendant's role in establishing policy for the admission of persons into the gated community. Any such role, would have been at most an oblique—as opposed to affirmative—contribution to the injury. Certainly, the residents of the community, acting through its homeowners' association (CZ Master), could determine gate-admission policy or even allow completely open access to the neighborhood. Such determinations, as a matter of law, do not affirmatively contribute to the injuries resulting from a criminal assault by a person entering through the gate. [¶] In addition, the Court finds that Plaintiff's claims are barred by the doctrine of primary assumption of risk. Here, as in *Herrle v. Estate of Marshall*, 45 Cal.App.4th 1761 [53 Cal.Rptr.2d 713] (1996), 'the particular risk of harm that caused the injury was the very risk plaintiff and [his] employer were hired to prevent.' *Id.* at 1765 . . . ."

I

As explained in *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116], "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' (Code Civ. Proc., § 437c, subd. (*o*)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854–855 [107 Cal.Rptr.2d 841, 24 P.3d 493].)"

Despite the statutory prohibition against plaintiff's relying upon allegations of the complaint to establish a triable issue, Tilley's opening brief on appeal

relies substantially upon such allegations to establish the factual underpinnings f this case, and to support such assertions as "[j]uvenile parties turning into drunken, out-of-control affairs punctuated by vandalism and fighting repeatedly occurred . . . in Coto," "there was a substantial, ongoing and known problem with unauthorized juvenile traffic streaming into Coto during . . . summer months," and "there had been multiple juvenile attacks upon Mr. Tilley—as well as other adults." Tilley asserts that to the extent these factual allegations were not specifically challenged in CZ's motion below, it is proper to rely upon them. CZ vehemently contends otherwise, pointing out that it filed a general denial, and thus that all allegations of Tilley's complaint are "controverted."

Both parties are correct to a certain extent. Tilley is allowed to rely upon the allegations of the complaint which were unchallenged in the motion itself, but only to demonstrate that CZ has not met its initial burden of showing an entitlement to summary judgment. For example, if a plaintiff had alleged three distinct breaches of duty which caused him a single injury, and the defendant filed a motion for summary judgment with evidence contradicting only two of those breaches, the plaintiff could rely upon the third, unchallenged, allegation of breach to demonstrate the motion was insufficient on its face to shift the burden.

■ Similarly, as explained in *Elcome v. Chin* (2003) 110 Cal.App.4th 310 [1 Cal.Rptr.3d 631], when the defendant does not challenge a particular element of the plaintiff's claim (in that case, damages) in its summary judgment motion, the plaintiff has no obligation to include any evidence in its opposition to support that element. Again, however, that conclusion is based upon the fact that the defendant, having ignored the element in its motion, has not met its initial burden of demonstrating that summary judgment would be warranted because of undisputed evidence. Consequently, no burden shifts to the plaintiff with respect to the issue.

However, if the moving defendant does claim undisputed facts which, if left uncontradicted would be sufficient to warrant a judgment in his favor, the burden shifts to the plaintiff, and everything changes. The plaintiff must "show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.)

The burden did shift in this case. CZ's initial showing was sufficient to place the burden on Tilley to demonstrate triable issues of fact. Moreover, CZ's motion specifically asserted, as undisputed facts, that BonaFide had never documented incidents of fighting, violence or underage drinking at homeowner parties between November of 1996 and July of 1998, and that neither CZ nor its property manager had been advised of any such problems. Tilley cannot attempt to undercut those assertions by relying upon the allegations of his complaint, as those allegations do not constitute evidence. Consequently, we disregard Tilley's references to what he alleged for purposes of establishing triable issues, and focus only on the evidence actually provided in connection with those issues.

With respect to CZ's objections to the evidence Tilley offered, they are part of the record before the trial court. The court specifically stated it had considered them, and had based its ruling only on admissible evidence. This summary approach to evidentiary rulings, based upon *Biljac Associates v. First Interstate Bank, supra,* 218 Cal.App.3d at pages 1419–1420, is not ideal, and has been criticized by many courts. However, on the record in this case, given the nature and volume of the objections, the trial court did not abuse its discretion in not ruling on each of them.

Tilley's suggestion that CZ waived its written objections by not repeating them orally at the hearing is rejected. Code of Civil Procedure section 437c, subdivision (b)(5) requires the objections to be made "at the hearing" but not orally. A written objection submitted for the court's consideration in connection with the hearing would be considered made "at the hearing." Requiring those objections to be repeated, out loud, for the court reporter's edification, serves no purpose whatsoever. CZ did not waive its objections.

## II

Turning to the merits, we must first reject Tilley's assertion, which permeates his opposition to the summary judgment, that he presented a triable issue of fact concerning CZ's potential liability as his "special employer." He pled no such claim. To the contrary, his complaint specifically alleges he was employed by BonaFide, and assigned by BonaFide to work at Coto pursuant to the contract it entered into with CZ. It does not allege any employment relationship with CZ.

The issue of a possible "special employment" relationship arose only after Tilley responded to an interrogatory asking him to identify anyone for whom he was acting as agent or employee at the time of the incident at issue. He responded by identifying BonaFide as his employer based upon "traditional

notions of employer-employee relations." However, he went on to explain that "to the extent the phrase 'agent or employee' is construed more broadly to encompass Mr. Tilley's relations with other[s] that possessed and exercised the power to set and control Mr. Tilley's scope of work and to define and shape Mr. Tilley's employment duties, then Mr. Tilley contends at the time of the [incident] that he was also acting as the 'agent and employee' of CZ Master Association, Merit Property Management, Inc., and Ranchos Colinas Association. [¶] . . . [¶] Mr. Tilley's primary duties—as set by BonaFide— were to serve as post supervisor and to perform the roving patrol function demanded by CZ Master Association, in accordance with instructions and directions as issued by CZ Master Association and/or its sub-associations, and Merit Property Management, Inc."

Concerned about the scope of that response, CZ, along with defendants Merit Property Management and Rancho Colinas Association—all of whom denied that any employment relationship existed between themselves and Tilley—moved to amend their answers to assert the workers' compensation exclusive remedy as a defense to any such claim. Tilley opposed those motions, arguing, among other things, that the defendants had misconstrued his answer, and that he had taken great pains to identify only BonaFide as his employer "based on 'traditional notions of employer/employee relations.' " He states expressly that his answer "cannot be construed as an admission—or contention—that he was the 'employee' of RCA, Merit or CZ . . . ."

■ Although the court properly allowed the defendants leave to interpose the defense (*Edwards v. Superior Court* (2001) 93 Cal.App.4th 172, 180 [112 Cal.Rptr.2d 838] ["The discretionary power to allow amendments to the pleadings 'in furtherance of justice' must be exercised liberally at all stages of the proceeding . . . ."]), the fact remains that Tilley vehemently denied any implication that he was seeking to establish any relationship of employer-employee as between himself and any defendant. And his denial was understandable, since Tilley had already received workers' compensation benefits from BonaFide. If he established any employment relationship against a defendant with its own workers' compensation coverage, he could not increase the amount of benefits he would receive, but would instead merely extinguish his claim in court against that defendant.[10]

---

[10] An employee can have more than one employer, usually a general and a special employer, and both are considered his employer for purposes of the workers' compensation law. (*Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848 [69 Cal.Rptr.2d 501].) The employee cannot sue either one in court if both have provided workers' compensation coverage. In the case of dual employment, one employer can fulfill its obligation by entering into a contract by which the other is required to secure such coverage for the employee. (Lab. Code, § 3602, subd. (d).) In that regard, we note that Tilley provided the court with a copy of CZ's invitation for bids on the security contract which was to commence on December 1, 1996, a contract

However, when CZ moved for summary judgment, Tilley did an about-face, suddenly suggesting the facts did give rise to the possibility that CZ was his special employer, because it had the power (even if unexercised) to affect the details of his work. He then argued that the court could infer CZ had no workers' compensation coverage, *based solely upon the fact that he had named it, but not BonaFide, as a defendant in the lawsuit,* and that under those circumstances, Labor Code section 3708, would preclude CZ from asserting assumption of the risk as a defense.

Tilley cannot have it both ways, denying any assertion that CZ might possibly be his employer when the specter of workers' compensation exclusivity is raised, but then embracing the notion as a possible means of avoiding summary judgment. His claims against CZ are limited to the theories pled in his complaint, and there he specifically alleged that his employer was BonaFide.

In any event, Tilley failed to demonstrate any triable issue of fact with respect to the issue of a special employment relationship between himself and CZ. According to his own testimony, he took his directions strictly from BonaFide. The scope of his duties were set forth in "post orders" which he stated were provided by BonaFide. "There would be not [*sic*] post orders coming from CZ Masters [*sic*] or Merit. They would be just directives requesting this or requesting that. The post orders had to come from BonaFide."[11] Tilley went on to explain that a post order had more authority than a directive from CZ, and that "a directive could override a post order only if it was approved by BonaFide." BonaFide provided the vehicles used by its officers to patrol Coto, and those vehicles were connected by radio to a dispatcher at BonaFide headquarters.

Tilley also testified about circumstances when he had implemented changes in the security procedures, explaining he discussed them with BonaFide personnel, but not with CZ. For example, Tilley stated he had implemented a policy that if a security guard came upon a situation involving a potentially violent person, the guard was to wait for backup before acting. He stated the policy was approved by BonaFide, but when asked if it had been approved by CZ, he responded "I didn't know if it was or not." He then explained "I didn't go to CZ Masters [*sic*] because that was my boss's responsibility." Tilley also testified that on approximately six occasions, members of the CZ

---

obtained by BonaFide. Among other things, the bidding specifications include a requirement that the security company hired by CZ must maintain workers' compensation coverage at its sole cost and expense.

[11] Scott Myers, the executive at BonaFide who handled the CZ account, testified that post orders may actually be "either provided directly from the client . . . or they are a combination of those directions combined with the documents that's [*sic*] produced by BonaFide." But that does nothing to alter Tilley's statement that any directions from CZ were subordinate to his instructions from BonaFide, and were followed only if approved by BonaFide.

board would request he alter some procedure, such as adding a special patrol in an area, and on those occasions he would inform them they would "have to go through BonaFide." He couldn't remember a single time when a CZ board member had asked him to do something and he had responded in any way other than simply referring them to BonaFide.

As Tilley's own testimony establishes, he had no substantial direct relationship with CZ. He took all his orders from BonaFide, and obtained BonaFide's approval for his actions. To the extent he became aware of directives from CZ, he understood they were subordinate to BonaFide's post orders. He relied upon BonaFide to resolve any concerns that CZ might have. Under those circumstances, there was no relationship of "special employment" between Tilley and CZ as a matter of law.

■ As explained by our Supreme Court in *Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 492 [162 Cal.Rptr. 320, 606 P.2d 355], "[w]hen an employer—the 'general' employer—lends an employee to another employer *and relinquishes to a borrowing employer all right of control over the employee's activities*, a 'special employment' relationship arises between the borrowing employer and the employee." (Italics added.)

In this case, there was no evidence BonaFide relinquished any control over Tilley, or that CZ ever directly exercised such control. Instead, what this evidence demonstrates is a tripartite relationship, with BonaFide squarely in the middle. Tilley answered to his employer, BonaFide, and BonaFide endeavored to keep its client, CZ, satisfied with the services provided. The combined effect of those relationships was that CZ would have had some power to affect Tilley's work situation and activities, but only an indirect one, and its influence extended only so far as BonaFide chose to allow. Such a relationship cannot be characterized as creating an "employment" between CZ and Tilley directly.

### III

■ "Under the peculiar risk doctrine, a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others. By imposing such liability without fault on the person who hires the independent contractor, the doctrine seeks to ensure that injuries caused by inherently dangerous work will be compensated, that the person for whose benefit the contracted work is done bears responsibility for any risks of injury to others, and that adequate safeguards are taken to prevent such injuries." (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 691.)

■ "A critical inquiry in determining the applicability of the doctrine of peculiar risk is whether the work for which the contractor was hired involves a risk that is 'peculiar to the work to be done,' arising either from the nature or the location of the work and ' "against which a reasonable person would recognize the necessity of taking special precautions." ' [Citations.] The term 'peculiar risk' means neither a risk that is abnormal to the type of work done, nor a risk that is abnormally great; it simply means ' "a special, recognizable danger arising out of the work itself." ' " (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 695, quoting *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 509 [156 Cal.Rptr. 41, 595 P.2d 619], and *Griesel v. Dart Industries* (1979) 23 Cal.3d 578, 586 [153 Cal.Rptr. 213, 591 P.2d 503].)

In *Privette,* however, the Supreme Court went on to conclude that a landowner's liability under the peculiar risk doctrine did not extend to the employees of the independent contractor itself—in that case a roofing contractor—if the contractor had provided them with workers' compensation coverage. The court reasoned that in the absence of direct negligence by the landowner, causing the injury, then allowing the worker to recover tort damages against it, in addition to the workers' compensation remedy from the employer, would be a windfall.

■ In *Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, the Supreme Court expanded *Privette,* concluding that an employee of a contractor may not sue the hirer of the contractor on a theory that the hirer failed to require that special precautions be taken to avert the peculiar risks of the work, or failed to ensure that such precautions were taken. Finally, in *Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, the Supreme Court considered whether a landowner could be held liable to the employee of an independent contractor on the basis the landowner had retained some control over the conditions of the contractor's work, as described in section 414 of the Restatement 2nd of Torts.[12] ■ The court concluded that such liability would exist only "insofar as a hirer's exercise of retained control affirmatively contributed to the employee's injuries." (27 Cal.4th at p. 202, italics omitted.)

In this case, the peculiar risk doctrine was generally applicable. BonaFide was an independent security company, and the services it performed for CZ, including controlling access to the premises, enforcing parking restrictions, responding to complaints and otherwise promoting and encouraging compliance with association rules, obviously presented peculiar risks.

---

[12] "Section 414 provides: 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.' " (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 201.)

The undisputed facts demonstrate that BonaFide was in control of how its work was performed, and that all decisions concerning the activities of its employees were ultimately its responsibility. As set forth in CZ's statement of undisputed facts, "BonaFide Security set the patrol routes and times, created security procedures, approved Security post orders and directives, trained and assigned officers, instructed its officers how to respond to parties and otherwise controlled the day-to-day operations of security for CZ within Coto. Individual officers used their discretion in determining whether to contact law enforcement or residents and visitors in responding to disturbances."

There is evidence that CZ and its property manager, Merit, may have had significant influence on how BonaFide made certain decisions concerning the work, but no more than would be expected in the case of a contractor seeking to keep its customer satisfied. There is no evidence that CZ had any power to *override* BonaFide's decisions concerning how its employees should conduct themselves. Tilley himself testified that he answered only to BonaFide, and that any changes CZ might wish to implement in the work he did had to be cleared through BonaFide.

There *was* evidence CZ retained control over certain aspects of the worksite—i.e., the association's property. BonaFide had no independent authority to change the scope of access to the property, or to impose restrictions on how the homeowners could use it. In this respect, the instant case presents an issue of retained control, as in *Hooker v. Department of Transportation, supra,* 27 Cal.4th 198.

In *Hooker*, the injured employee was a crane operator, and his employer was hired by the California Department of Transportation, (Caltrans) to expand an overpass. During the project, the overpass remained in use, for construction vehicles, and each time a vehicle passed, Hooker had to retract the "outriggers" on his crane to make room. After he had done so on one occasion, he attempted to rotate the crane without first reextending the outriggers. The crane became unbalanced and toppled over, killing Hooker. His wife sued, alleging Caltrans had negligently exercised its retained control over the safety conditions on the property by allowing construction vehicles to continue using the overpass where Hooker operated his crane.

The Supreme Court concluded that such a claim would be sufficient to support liability, but only if the hirer "exercised the control that was retained in a manner that affirmatively contributed to the injury of the contractor's employee." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 210, italics omitted.) It concluded that no such "affirmative" contribution could be shown in that case. "Perhaps the clearest way to put it

is this: Caltrans *permitted* construction vehicles, as well as vehicles owned and operated by Caltrans, to use the overpass while the crane was being operated, and because the overpass was narrow, the crane operator was *required* to retract the outriggers in order to let the traffic pass. That is what plaintiff asserted below . . . . [¶] We are not persuaded that Caltrans, by *permitting* traffic to use the overpass while the crane was being operated, *affirmatively contributed* to Mr. Hooker's death. . . . 'Under the "active participation" standard, a principal employer is subject to liability for injuries arising out of its independent contractor's work if the employer is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control occurs, for example, when the principal employer *directs* that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished. [Citations.]' (*Thompson* [*v. Jess* (1999)] 1999 UT 22 [979 P.2d 322, 327], italics added.) To repeat, Caltrans did *not* direct the crane operator to retract his outriggers to permit traffic to pass." (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at pp. 214–215.)

In this case, there is likewise no evidence that CZ's exercise of the authority it retained over the premises affirmatively contributed to Tilley's injuries. Like Caltrans in *Hooker*, CZ is accused of permitting others (in this case, residents and their guests) to have access to the premises for parties, thus increasing the danger to the contractor's employees. But that conduct, just like Caltrans's conduct of allowing others to use the overpass in *Hooker*, is merely passive. CZ did not host the parties, did not direct anyone to have them, and according to the undisputed evidence, was not given advance notice of them. CZ's misconduct amounts to merely a failure to exercise its (presumed) power to restrict or impose controls over the parties. Such a failure cannot be the basis of liability.

Moreover, just as Caltrans did not require Hooker to retract his outriggers in response to traffic on the overpass, CZ did not direct Tilley to respond to the situation at the S.'s home by confronting and purporting to "arrest" a presumed wrongdoer. As Tilley himself alleged in his complaint, the basic premise of the agreement between BonaFide and CZ was that "BonaFide personnel were not required nor expected to perform arrests or confront lawbreakers as part of their regular employment duties . . . CZ Master Association made clear to BonaFide and its personnel that they did not have the authority, power or right to comport themselves or otherwise act as law enforcement officials in the performance of their employment duties and/or their interaction with the community."

CZ asserted, as undisputed facts, that BonaFide guards were expected to use their judgment in responding to situations, CZ relied upon BonaFide's policy for each officer to observe and report incidents and violations of law, rather than get in harm's way, and it never instructed BonaFide guards to carry out arrests or detentions. Tilley's own testimony supported those alleged facts, and he failed to offer any evidence to dispute them.[13] Under those circumstances, CZ cannot have any liability for Tilley's decision to step out of his "observe and report" function to confront the Carrenos. There is simply no evidence that CZ expected, let alone required, that he do so.

Finally, it is irrelevant that CZ knew or should have known that Tilley (or other guards) had confronted and detained or arrested wrongdoers in the past. The same type of argument was made in *Hooker*, and rejected by the Supreme Court: "there was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the . . . crane operator['s practice of retracting the outriggers to permit construction traffic to pass]. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 215.)

██ Under the *Privette* doctrine, and its extension in *Hooker*, the undisputed facts of this case demonstrate CZ could not be held liable to Tilley based upon its alleged failure to exercise its retained control over the association property so as to restrict or control youth parties on the premises.

IV

In addition to determining CZ had no liability to Tilley under the peculiar risk doctrine, we also conclude CZ owed Tilley no independent duty to restrict the parties thrown by its homeowners, or to control the number of nonresidents allowed to attend those parties.

██ Duty, of course, is primarily a matter of law, not fact. (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) "It is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Ibid.*, citing Prosser, Law of Torts (4th ed. 1971) pp. 325–326.)

In *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398 [1 Cal.Rptr.3d 762], relied upon by CZ, the court concluded that the defendant had no duty to refuse the use of its premises for an all-night rave party, even

---

[13] What he offered amounted to an agreement concerning the significance of CZ's evidence on the point.

though drinking and drug use by partygoers was foreseeable. The court rejected the notion that such parties were "inherently dangerous" because no partygoers were required to engage in dangerous or illegal conduct, and explained that imposing "ordinary negligence liability on a business owner that has done nothing more than allow its facility to be used for an all-night party, even if we assume [it] knew that drugs would be used at the party, would expand the concept of duty beyond any current models." (*Id.* at p. 406.)

 In reaching its decision, the *Sakiyama* court considered the well-known factors set out in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561], to determine whether a legal duty of care existed: "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved."

 While foreseeability is a primary issue in determining duty, "fore-seeability alone is not sufficient to create an independent tort duty. . . . [Citation.] Because the consequences of a negligent act must be limited to avoid an intolerable burden on society (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582]), the determination of duty 'recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.' (*Ibid.*, fn. omitted.) '[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.' (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814].) In short, foreseeability is not synonymous with duty; nor is it a substitute." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978].)

In this case, the evidence supporting foreseeability was slight, at best. Despite Tilley's sweeping assertion concerning the numerous violent juvenile parties that took place regularly in Coto, the evidence established only one occasion in which a party had erupted into violence prior to the 1998 party at issue in this case. That incident was the S.'s 1997 party, when Tilley himself responded to a report involving an altercation between the S.'s daughter Torri, and John Jesme. According to Tilley's own report, the party, while large, was adequately supervised by adults. Moreover, the violence was not the product of homeowners allowing a party to grow too large, or of

nonresidents being allowed access to the premises. To the contrary, the problem was that Torri S. *was* attempting to restrict access to her party, and the person she was seeking to bar was a Coto resident.

There is evidence of two other incidents of youth violence against adults within Coto in the record, but they are not sufficiently similar to the incident at issue here to support foreseeability. Those incidents were not related to parties, and the perpetrators in both cases included Coto residents, accompanied by their friends. Nothing in any of these incidents suggested any problem which could be cured by limiting the size of residents' parties or imposing more stringent restrictions on access to such parties by non-residents of Coto.

Additionally, none of the other *Rowland* factors (other than perhaps the certainty of plaintiffs' injury) support imposing a duty in this case. The connection between the defendant's conduct—failing to impose restrictions on homeowner parties—and the injury suffered, is attenuated at best. Tilley was injured after the S.'s party was over, and the Carrenos were in their car attempting to leave. It was Tilley's attempt to detain them, not the fact that the party had taken place, which was the immediate cause of the assault. Of course, there is no moral blame attached to allowing a homeowner to host a party, and the policy of preventing future harm would be little served by restricting parties, as the typical problems associated with parties, according to Tilley's own testimony, were noise and parking violations—not violence.

Moreover, the burden to CZ and consequences to the community of imposing a duty to place restrictions on residents' parties, with resulting liability for breach, would appear to be enormous. Any mishap at a party within Coto would presumably give rise to at least a colorable claim against CZ. Additionally, the undisputed evidence is that the community's Covenants, Conditions, and Restrictions (CC&R's) gave CZ no specific power to regulate parties within the residents' own homes. While Tilley argues that CZ could have regulated parties through use of the CC&R provision prohibiting nuisance, that would not have been effective. The nuisance regulation did not declare that parties, or even large parties, constituted a nuisance. Instead, it merely stated that a "noise or other nuisance" which was "offensive or detrimental" to other residents, was prohibited. That would allow an overly-loud or raucous party to be stopped (as BonaFide guards sometimes did), but included no authority to prevent it in the first place.

And finally, it is undisputed that BonaFide had already insured against the risks encountered by its employees during the course of their work, through the workers' compensation system.

Based upon all of those factors, we conclude CZ had no duty to restrict access to the community or to regulate the parties hosted by its residents. Like the *Sakiyama* court, we do not consider parties to be "inherently dangerous," even assuming that underage drinking would take place. They may be unwise, troublesome, nasty, brutish and long, but they are not "inherently dangerous." More specifically, there is no evidence these parties posed any significant danger to the BonaFide security guards who patrolled Coto, so long as those guards limited their involvement and avoided placing themselves in harm's way. The problem in this case was Tilley did not. He chose to confront and attempt to detain a partygoer who was leaving the scene. Such conduct was not a required or expected part of his job, and was not a circumstance CZ was obligated to protect against.

V

We have concluded Tilley offered no evidence to create a triable issue of fact on his claim CZ either expressly or impliedly required the security guards to act aggressively in confronting problems with youth parties, thus placing themselves at risk. However, even if he had, summary judgment would have been appropriate based upon the primary assumption of risk doctrine.

As explained by the Supreme Court in *Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532 [34 Cal.Rptr.2d 630, 882 P.2d 347], the primary assumption of risk doctrine, as applied in the employment context, provides that one who hires a person to confront a particular risk, owes no duty to protect the person against that risk. As explained in *Neighbarger*, "it is unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." (*Id.* at p. 542.)

In *Herrle v. Estate of Marshall, supra,* 45 Cal.App.4th 1761, this court applied the primary assumption of risk doctrine to bar a nurse's aide, employed specifically to care for a violent patient who attacked and injured her, from recovering damages from that patient. Additionally, the doctrine has been applied to preclude recovery by veterinarians who were injured by the animals they were hired to treat. (See *Cohen v. McIntyre* (1993) 16 Cal.App.4th 650 [20 Cal.Rptr.2d 143]; *Willenberg v. Superior Court* (1986) 185 Cal.App.3d 185 [229 Cal.Rptr. 625]; *Nelson v. Hall* (1985) 165 Cal.App.3d 709, 714 [211 Cal.Rptr. 668] [claim by veterinarian's assistant].)

Although Tilley argues the primary assumption of risk doctrine cannot be applied against a private (as opposed to public) safety officer, citing *Neighbarger v. Irwin Industries, Inc., supra*, 8 Cal.4th 532, that case establishes no such rule. Instead, as we have already explained in *Herrle v. Estate of Marshall, supra*, 45 Cal.App.4th 1761, 1772–1773, *Neighbarger*'s refusal to apply the doctrine (in that case specifically the firefighter's rule) was based upon the fact that the plaintiffs' claims had been asserted against a thirdparty wrongdoer, and not the entity which had hired them to undertake the risk.

As *Neighbarger* explained, "if we focus on the defendant and the question of the defendant's duty toward plaintiff, we see that the third party defendant stands in a different relation to the private safety worker than members of the public stand to the public firefighter." (*Neighbarger v. Irwin Industries, Inc., supra*, 8 Cal.4th at p. 542.) "[W]hen a safety employee is privately employed, a third party lacks the relationship that justifies exonerating him or her from the usual duty of care. The third party, unlike the public with its police and fire departments, has not provided the services of the private safety employee. Nor has the third party paid in any way to be relieved of the duty of care toward such a private employee. Having no relationship with the employee, and not having contracted for his or her services, it would not be unfair to charge the third party with the usual duty of care towards the private safety employee." (*Id.* at p. 543.)

In this case, however, CZ is itself the entity which is alleged to have engaged Tilley to confront potentially violent young partygoers in Coto—an extension of the more passive "observe and report" function normally required of BonaFide security guards. Assuming that allegation were proven, it would establish that CZ hired Tilley to confront the very hazard which resulted in his injury, and would thus exonerate CZ from any duty to protect him from that hazard. Under those circumstances as well, summary judgment would be appropriate.

## VI

Finally, Tilley argues the court abused its discretion in denying his last-minute request for an additional continuance of the summary judgment hearing. Because Tilley's request was not filed as part of his opposition to the motion, it did not fall within the parameters of Code of Civil Procedure section 437c, subdivision (h): "The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time

on or before the date *the opposition response to the motion is due*." (Italics added.) Consequently, there was no special onus on the court to grant the request.

Instead, the court had discretion to do so if it felt the additional continuance was warranted. In his request, Tilley explained that on August 29, he had served CZ with a notice of custodian of records deposition, including a 15-page list of requested document categories. CZ objected to the notice on September 4, and refused to appear. CZ followed its objection with a letter explaining the request was significantly duplicative of a prior custodian of records deposition for CZ, and offering to compromise with a limited second deposition. Apparently that did not occur. Tilley also argued that a continuance was necessary to allow him leave to amend his complaint to specifically allege a "special employment" relationship between himself and CZ, which he had relied upon significantly in his opposition to the summary judgment motion. He stated that he believed that such an amendment might be necessary because CZ had argued in its reply brief that the failure to plead the theory precluded Tilley from arguing it.

CZ opposed the motion, noting Tilley had made no reference to the necessity of further discovery in his opposition to the summary judgment motion, and had previously obtained two continuances of the motion. It also pointed out that during the five months the summary judgment motion had been pending, Tilley had conducted no discovery other than its last-minute attempt to depose CZ's custodian of records. CZ also argued it would be prejudiced if Tilley were allowed to amend his complaint to add an additional claim of liability based upon "special employment" on the eve of the summary judgment hearing, as time constraints precluded it from any opportunity to revise and refile the motion to meet that new allegation prior to the trial date.

Under those circumstances, there was no abuse of discretion in the court's decision to deny the continuance. A clear implication from the facts is that Tilley was manipulating the circumstances to delay summary judgment for as long as possible. He waited until the very last minute to commence any discovery; but then abandoned the effort when CZ did not acquiesce, and filed his opposition without claiming any need for it. His opposition relied heavily on the possibility of a "special employment" relationship, a theory which he had previously denied asserting, to defeat summary judgment. And it was only after he received CZ's reply brief, in which it noted his failure to actually allege any such claim, that he suddenly felt the need to complain about his previously thwarted discovery.

The court could easily have concluded that Tilley's goal was merely to avoid the summary judgment by whatever means were necessary until it was too late for such a motion to be heard. If that was his goal, he could not count on court cooperation.

The judgment is affirmed.

Moore, J., and Fybel, J., concurred.

A petition for a rehearing was denied August 25, 2005, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 26, 2005.