*1016 LIU, J.,
Concurring. — Because Carolyn Gregory’s injuries resulted “from the very condition or hazard the defendant has contracted with [her employer] to remedy or confront” (Neighbarger v. Irwin Industries, Inc. (1994) 8 Cal.4th 532, 542 [34 Cal.Rptr.2d 630, 882 P.2d 347]), I agree that her claims are barred under the primary assumption of risk doctrine. (Maj. opn., ante, at p. 1009 [“[T]he important consideration is that Bernard Cott contracted with an agency that promised to provide him an aide trained to manage his wife’s condition. By doing so, he paid to be relieved of a duty to protect the aide from the very risks she was retained to encounter.”].) At the same time, it should be apparent from today’s opinions that this case raises some difficult issues.
At a doctrinal level, it is not obvious that casting our holding in terms of primary assumption of risk is altogether dissimilar from a finding of summary judgment for the Cotts, on these facts, under the secondary assumption of risk doctrine. I agree that “[o]ur holding does not preclude liability in situations where caregivers are not warned of a known risk, where defendants otherwise increase the level of risk beyond that inherent in providing care, or where the cause of injury is unrelated to the symptoms of the disease.” (Maj. opn., ante, at p. 1000.) Further, “[t]he rule we adopt is limited to professional home health care workers who are trained and employed by an agency.” (Id. at pp. 1008-1009.) In light of these caveats, I also agree with Justice Rubin that disputes about these relevant facts will arise in future cases, and such cases will be analyzed under secondary assumption of risk. (Dis. opn., post, at pp. 1025-1026; see id. at p. 1024 [primary assumption of risk “is founded on an absence of factual disputes”].) In today’s case, the majority and dissent disagree on whether “[t]he relevant facts are undisputed.” (Maj. opn., ante, at p. 1000; compare id. at pp. 1000, 1009, 1010 with dis. opn., post, at pp. 1020-1023.) But if one accepts (as I do) the majority’s view of the facts, I am not sure the result would be so different whether the doctrinal label is primary or secondary assumption of risk. For if it is “undisputed” that Gregory’s injury occurred within the scope of her caregiving duties, that Bernard Cott hired Gregory believing she was adequately trained, and that Bernard suitably warned Gregory, did not deceive her, and did nothing to increase the level of risk beyond that inherent in providing care (maj. opn., ante, at pp. 1000, 1009, 1010, 1011), then it is not obvious a mere allegation that Bernard should have done more to prevent Gregory’s injury would be sufficient to allow this case to go to a jury. Similarly, it is questionable on this record whether the bare allegation of battery against an 85-year-old woman “who had long suffered from Alzheimer’s disease” (id. at p. 1000) presents a triable issue.
This factually cabined approach to applying primary assumption of risk may seem anomalous, since the firefighter’s rule and the veterinarian’s rule appear to cover broader and more discrete categories of activity. Justice *1017 Rubin is correct to say, in light of today’s limited decision, “At some point, primary assumption of risk will apply, but what is that point? Does not that inquiry undermine part of the utility of the doctrine of primary assumption of risk?” (Dis. opn., post, at p. 1025.) But, as Justice Rubin observes elsewhere (id. at pp. 1021-1023), even the firefighter’s rule is subject to factual limitations. (See, e.g., Donohue v. San Francisco Housing Authority (1993) 16 Cal.App.4th 658, 660 [20 Cal.Rptr.2d 148] [no primary assumption of risk for firefighter who slipped on wet stairs while conducting a fire safety inspection].) Indeed, courts have always had to make factual determinations to decide whether the actors and the source of harm are of a type properly considered under primary assumption of risk. (See, e.g., Knight v. Jewett (1992) 3 Cal.4th 296, 320 [11 Cal.Rptr.2d 2, 834 P.2d 696] [“a participant in an active sport” owes no duty of care to “other participants” unless his conduct “is so reckless as to be totally outside the range of the ordinary activity involved in the sport”].) Analytically, today’s role is no different, even if the definition of the activity to which primary assumption of risk applies is more circumscribed.
Ultimately, for me what tips the balance in favor of primary assumption of risk is that the tort system does not appear to be the proper forum for ensuring adequate compensation for on-the-job injuries suffered by home health aides, at least in cases like this one. The dissent argues that because “the family has extensive, if not exclusive, control” over a private home, “family members should likewise retain liability.” (Dis. opn., post, at p. 1020.) But the dissent does not say what Bernard Cott should have done to mitigate the hazards that his wife’s illness posed to Gregory. Indeed, there is no reason to think that a family member who lives with an Alzheimer’s patient does not already have every incentive to adopt prudent and reasonable safety measures inside the home, for what happened to Gregory could just as easily have happened to Bernard himself. How is a family member, a court, or a jury to know, without the benefit of hindsight, what additional modifications or safety devices will be necessary in this kind of situation? It seems doubtful that a liability role would do much to improve home safety. It would more likely saddle ordinary families who are doing their best in difficult circumstances with potential costs they cannot realistically avoid.
At the same time, it is difficult to ignore the compelling public policy interest in ensuring that low-paid home health care workers receive adequate protection. (See dis. opn., post, at pp. 1026-1027; Cal. Employment Development Dept., Summary Guide for Home Health Aides in Cal. (2014) <http://www.labormarketinfo.edd.ca.gov/OccGuides/Summary.aspx? S occode=311011 &Geography=0601000000> [as of Aug. 4, 2014] [median annual wage in 2014 for home health aides in California was $23,267].) Applying primary assumption of risk, even when limited to a subset of cases, makes it likely that some home caregivers will face workplace hazards *1018 without adequate compensation. Although we might expect such a rule to decrease the willingness of individuals to serve as home health care workers, thereby raising wages or increasing benefits such as insurance, ordinary labor market behavior may be eclipsed by the neediness and limited bargaining power of these workers.
This less-than-satisfying state of affairs brings me to a final point: It is often because family members have determined they are unable to manage an Alzheimer’s patient by themselves that they turn to home health care agencies like the one Gregory worked for. These agencies advertise their credentials and expertise in caring for Alzheimer’s patients, and that is a significant part of what the family is buying. In such service arrangements, the best cost avoider would seem to be the home health care agency. (Dis. opn., post, at p. 1019, fn. 1; see generally Calabresi, The Cost of Accidents: A Legal and Economic Analysis (1970).) As repeat players who hold themselves out as qualified and competent care providers, the agencies are far better positioned than their workers or their clients to assess risks, to devise reasonable safety measures, to provide proper training to caregivers, and to determine whether in-home care is appropriate for a patient in the first instance and on an ongoing basis as a disease progresses.
Given the broad scope of the workers’ compensation scheme, which precludes Gregory from suing her employer in tort, courts have limited risk-allocation mechanisms to address the difficult problems this case raises. I am reluctant to push these problems into the tort system because that approach conceives of cases like this one as private disputes between low-wage workers and ordinary families who are poorly positioned to mitigate risks or absorb the costs of injuries. What this case really presents is the broader policy issue of how to improve the safety, training, and protection of workers in home caregiving arrangements. Like every member of the court, I believe this issue is worthy of the Legislature’s attention.
RUBIN, J.,*
Dissenting. — Tort law ordinarily aims to compensate a person wrongfully injured by another. (See Civ. Code, §§ 1714, subd. (a), 3333; Erlich v. Menezes (1999) 21 Cal.4th 543, 550 [87 Cal.Rptr.2d 886, 981 P.2d 978].) Primary assumption of risk departs from that goal. Herrle v. Estate of Marshall (1996) 45 Cal.App.4th 1761 [53 Cal.Rptr.2d 713] (Herrle) applied primary assumption of risk against a certified nurse’s aide working in a convalescent home to deny the aide’s recovery of damages from an Alzheimer’s patient who struck the aide as the aide was moving the patient from a chair to a bed. Embracing Herrle as the “case most closely on point” (maj. opn., ante, at p. 1003), the court’s decision today extends primary assumption of risk to appellant Carolyn Gregory, an unlicensed in-home caregiver injured *1019 while washing dishes in the home of Bernard and Lorraine Cott. The foundation of the court’s holding is that the Cotts hired Gregory to face the risk from Lorraine Cott’s Alzheimer’s disease that caused Gregory’s injury. The majority states: “It is a settled principle that those hired to manage a hazardous condition may not sue their clients for injuries caused by the very risks they were retained to confront.” (Maj. opn., ante, at p. 1000.) Because Bernard Cott hired Gregory to care for Lorraine, it is by the majority’s estimation unfair to impose liability on the Cotts if Lorraine injured Gregory while Gregory was delivering such care. (Neighbarger v. Irwin Industries, Inc. (1994) 8 Cal.4th 532, 542 [34 Cal.Rptr.2d 630, 882 P.2d 347] (Neighbarger); maj. opn., ante, at p. 1002.)
I do not quarrel with the moral blamelessness of defendants- — Lorraine Cott, who suffers from sufficiently advanced Alzheimer’s disease that she may not be fully responsible for the injury she caused Gregory (though she remains subject to legal liability under Civ. Code, § 41) and her husband, Bernard, who acted in difficult circumstances, to say the least. But Bernard Cott was the competent decision maker who chose in-home care for his wife, Lorraine. I believe tort law should align incentives with the consequences of the decisions one makes. Thus, when a family considers the suitability of in-home care for a member suffering from Alzheimer’s disease, the law should encourage family members like Bernard Cott to weigh the benefits of in-home care against the costs it may impose on others.[1] The question this case presents is who ought to bear the cost when that decision goes awry? Who ought to bear the risk that a family may guess wrong about the threat one of its members poses because of Alzheimer’s disease? The majority answers Gregory should. I do not believe that either the facts or public policy support making in-home caregivers another category of worker, joining firefighters, police officers, and veterinarians, who suffer an unusual restriction, in the guise of primary assumption of risk, of their right to recover from third parties for on-the-job injuries.
For this reason, I dissent.
*1020 I. The Reality of In-home Caregiving for Alzheimer’s Patients Does Not Warrant Primary Assumption of Risk

The Jobsite

In Herrle, the Alzheimer’s patient was institutionalized in a convalescent home. Thus, the nurse’s aide caring for the patient was in a workplace that her employer governed, with the employer controlling on-the-job safety measures. When safety measures prove inadequate to prevent on-the-job injury, the employer is ordinarily liable to the caregiver under workers’ compensation laws. The institutionalized Alzheimer’s patient, on the other hand, has little or no liability, but neither does the patient have any control or authority over the workplace. The patient’s lack of authority squares with the patient’s absence of liability.
A private home is different. There, the family has extensive, if not exclusive, control. The in-home caregiver and her employer, on the other hand, have little control over the workspace. Unlike the dog owner in Priebe v. Nelson (2006) 39 Cal.4th 1112, 1129 [47 Cal.Rptr.3d 553, 140 P.3d 848], who boarded his animal at a commercial kennel, a family who hires an aide to care for a family member in the home does not “completely relinquishQ the care, custody, and control” of the person to a “professional” operating in a facility under that professional’s full control.
Because family members retain control, family members should likewise retain liability. But the court’s decision today weakens the link between control and accountability by relieving the family from needing to be concerned about dangers to the in-home caregiver so long as those dangers arise from the family member’s Alzheimer’s disease.

Job Training

The court supports applying primary assumption of risk to Gregory by noting she had received training in working with Alzheimer’s patients, and was therefore better positioned than Bernard Cott to protect herself from Lorraine. But case law does not look to training in other applications of primary assumption of risk. (See Neighbarger, supra, 8 Cal.4th at p. 537 [assumption of risk does not consider plaintiff’s subjective awareness of risk].) We do not ask whether a firefighter has been trained to fight a particular type of fire before we apply primary assumption of risk. Volunteer firefighters are also subject to the firefighter’s rule. (Baker v. Superior Court (1982) 129 Cal.App.3d 710, 717-718 [181 Cal.Rptr. 311].) We do not ask whether a veterinarian has worked with a particular breed of dog. And we do not ask whether a recreational athlete knows the rules of the sport.
*1021 In any case, the record in this case shows Gregory’s training was lacking. In deposition, Gregory answered the question “[W]ere you trained in how to deal with a client suffering from Alzheimer’s?” with her reply, “Very much so.” But her declaration, which fleshes out her answer, suggests that her “very much so” was in fact very little. Her training consisted of “watching a video and visiting a nursing home with Alzheimer’s patients.” She had never worked in a nursing home or hospital. She did not have certification as a nurse or nurse’s aide, and, having worked only in single-family homes, had never worked under the direct supervision of a registered nurse or health care professional. The lack of supervision from a registered nurse or medical professional continued while she worked for the Cotts. The majority states, “The rule we adopt is limited to professional home health care workers who are trained and employed by an agency.” (Maj. opn., ante, at pp. 1008-1009.) If the majority’s opinion is founded on the amount of training Gregory received, I suggest the foundation is lacking in this record. Stated differently, if a defendant must establish that a home health caregiver received adequate training before primary assumption of risk is triggered, in this case there is at least a triable issue of fact on that issue, and the trial court should have denied summary judgment.

The Risk

Bernard Cott hired Gregory because his wife suffered from Alzheimer’s disease, an affliction for which violent outbursts are a foreseeable risk in the disease’s later stages. But not every patient with advanced Alzheimer’s is violent, and violence is not common during the disease’s early stages. Thus, exposure to violence is not inherent in caring for all Alzheimer’s patients. Moreover, a number of occupations exist in which practitioners face a foreseeable risk of violence, but the law so far does not apply primary assumption of risk. Psychiatrists, psychologists, family therapists and counselors for at-risk populations face many of the same challenges in their offices as those treating Alzheimer’s patients; indeed, some of their clients may even be Alzheimer’s patients and their families. The fact an occupation involves some peripheral risks of injury does not in itself justify application of primary assumption of risk to all workers or trainees in that occupation. “[T]he firefighter’s rule was not intended to bar recovery for all hazards that are foreseeable in the employment context, but to eliminate the duty of care to a limited class of workers, the need for whose employment arises from certain inevitable risks that threaten the public welfare.” (Neighbarger, supra, 8 Cal.4th at p. 542; see Patterson v. Sacramento City Unified School Dist. (2007) 155 Cal.App.4th 821, 839-842 [66 Cal.Rptr.3d 337] [primary assumption of risk inapplicable to truck driving trainee injured loading freight on flatbed truck]; but see Hamilton v. Martinelli & Associates (2003) 110 Cal.App.4th 1012, 1016-1017 [2 Cal.Rptr.3d 168] [primary assumption of risk applies to probation officer injured during self-defense training].)
*1022 Courts have been reluctant to extend primary assumption of risk to workers beyond firefighters, police officers, and veterinarians, and even for those occupations courts appear to stretch to avoid applying the doctrine. That reluctance is evident in two Court of Appeal decisions the majority cites with seeming approval. (Maj. opn., ante, at p. 1010, fn. 9.) The first case is Donohue v. San Francisco Housing Authority (1993) 16 Cal.App.4th 658 [20 Cal.Rptr.2d 148] (Donahue), involving a firefighter who slipped on wet stairs while conducting an unannounced fire safety inspection in a building. (Id. at p. 660.) The second case is Kocan v. Garino (1980) 107 Cal.App.3d 291 [165 Cal.Rptr. 712] (Kocan), involving a police officer who leapt over a homeowner’s crumbling fence in hot pursuit of a felony suspect who ran onto the homeowner’s property. When the officer jumped the fence, it collapsed because the homeowner had let it fall into a “dilapidated and unsafe condition.” (Id. at p. 292.)
Both Donohue and Kocan declined to extend primary assumption of risk to the firefighter and police officer while performing job-related tasks because, by each court’s analysis, their injuries were caused by “factors independent of the activity that required” the officer’s or firefighter’s presence. (Maj. opn., ante, at p. 1010, italics omitted.) In Donohue, the Court of Appeal found primary assumption of risk did not bar the firefighter’s lawsuit against the building’s owner because the firefighter was in the building to inspect for fire code violations, not to inspect the slipperiness of the stairs, and it was their slipperiness that caused his injury. (Donahue, supra, 16 Cal.App.4th at p. 663.) In Kocan the trial court sustained the homeowner’s demurrer based on primary assumption of risk, but the appellate court reversed, holding the doctrine did not apply because the homeowner’s negligence, if any, in letting the fence fall into disrepair did not create the risk that summoned the officer to the homeowner’s property. (Kocan, supra, 107 Cal.App.3d at pp. 295-296.)
The distinctions drawn in Donohue and Kocan are thin indeed, but they illustrate the tendency to push back against exempting third parties for liability to workers for on-the-job injuries. But for his occupation, the firefighter in Donohue likely would not have been inside the building conducting an unannounced inspection. And but for being a police officer, the officer in Kocan likely would not have been chasing a fleeing criminal onto private property by leaping over a homeowner’s fence. Both of those public servants were engaged in tasks that were part and parcel of their public duties — a firefighter looking for fire hazards in order to prevent fires, and an officer trying to apprehend a criminal. But even though they were performing tasks involving risks for which the public had hired them, primary assumption of risk did not apply.
*1023 But as for Gregory? The majority concludes primary assumption of risk applies because the central reason for her employment by the Cotts — caring for Lorraine through tasks such as bathing, clothing, and feeding her — also incidentally included washing dishes, which led to her injury. (Maj. opn., ante, at p. 1010.) But the central reason for a firefighter’s employment is fighting fires, and fire safety inspections are intimately tied to fighting fires by preventing them. And the central reason for a police officer’s employment is fighting crime, which is intimately tied to capturing fleeing criminals. Here, Gregory’s purpose was to provide home health care; it was not to wrestle over a kitchen knife. I do not suggest that primary assumption of risk should have applied in Donohue and Kocan, but if it does not apply to a police officer in hot pursuit and a firefighter performing a fire safety inspection, then why apply it to a home health care worker washing dishes?
II. Neither Public Policy nor Judicial Economy nor Availability of Workers’ Compensation Insurance Supports Applying Primary Assumption of Risk

Institutionalization

The majority concludes the emerging public policy against institutionalization supports applying primary assumption of risk. (Maj. opn., ante, at pp. 999-1000, 1012-1015.) The majority reasons that treating injuries caused by Alzheimer’s patients who are institutionalized differently from injuries caused by Alzheimer’s patients at home will create an incentive to institutionalize Alzheimer’s patients. I believe the majority overstates the public policy favoring deinstitutionalization of Alzheimer’s patients. I am also inclined to think the risk of overinstitutionalization is speculative.
Public policy leans against unnecessary institutionalization. (See, e.g., Health & Saf. Code, § 1727.7.) Sometimes institutionalization may be preferable, or even necessary, especially when risk of physical injury to the patient or others exists. The movement toward deinstitutionalization is a healthy corrective to overinstitutionalization in past decades, when many patients suffering mental illness or other disabilities were warehoused and left untreated. In recent years, changing cultural attitudes and the psychopharmacological revolution, which offers for many psychiatric patients effective treatment that permits independent living, have helped sustain the trend toward deinstitutionalization described by the majority. Alzheimer’s disease is not, however, a mental illness like depression or schizophrenia, for which treatments exist. Alzheimer’s disease physically destroys the brain. Nothing in the record suggests reliable treatment, relief, or cure currently exists. It is a terminal condition inexorably leading to mental incapacity, physical helplessness, and death.
*1024 The California Adult Day Health Care Act (Act; Health & Saf. Code, § 1570 et seq.) which the majority cites (maj. opn., ante, at pp. 1014-1015) expresses a policy preference for minimizing institutionalization of the elderly and disabled. I agree society should avoid institutionalization when better alternatives are available. By promoting community-based adult day care, the Act advances that commendable goal. But promoting alternatives to institutionalization does not mean institutionalization is to be avoided at all costs. Nor does that goal address how society ought to allocate tort liability for injuries caused by Alzheimer’s patients who are not institutionalized. For even if it is salutary not to institutionalize, I do not believe that desirable result should be subsidized on the backs of low-paid in-home caregivers. By dissenting, I do not intend to encourage or discourage institutionalization. Rather, I suggest we encourage those who decide to provide in-home care for a family member with Alzheimer’s to take into account the true costs of their decision, which includes a risk of injury to caregivers.
Despite urging that we structure tort law to encourage families to take into account the risk of injury to others in deciding how to care for a family member with Alzheimer’s, I do not believe we would see a rush toward institutionalization. Choosing to move a family member suffering from Alzheimer’s disease to an institutional setting is fraught for most families. For many, the decision will touch upon matters such as family history, cultural traditions, intergenerational obligations, and emotion. Affordability will also play a role, as will the physical demands of caring for someone in decline. I am inclined to think that for most families, questions of liability will be among the least of concerns. Thus, I believe that the worry about creating an incentive to overinstitutionalize if we do not extend primary assumption of risk to in-home care is at best speculative.

Judicial Economy

Primary assumption of risk has the virtue of allowing its expeditious application by trial courts, often by summary judgment. (Knight v. Jewett (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696] [assumption of risk a legal question amenable to summary judgment].) The majority opinion observes that “[w]hether a duty of care [under primary assumption of risk] is owed in a particular context depends on considerations of public policy, viewed in light of the nature of the activity and the relationship of the parties to the activity. (Neighbarger, [supra, 8 Cal.4th] at p. 541; Knight, at pp. 314 — 315.)” (Maj. opn., ante, at pp. 1001-1002.) In short, whether a duty is owed depends on the job and the risk; a firefighter fighting a fire, for instance. (Neighbarger, at p. 538.) The doctrine is founded on an absence of factual disputes.
*1025 The majority states its rule is “limited to professional home health care workers who are trained and employed by an agency.” (Maj. opn., ante, at pp. 1008-1009.) Likewise, according to the majority, primary assumption of risk does not apply in the absence of a suitable warning. (Id. at p. 1000.) Factual disputes about warnings and training likely will remove many of these cases from resolution by summary judgment.
The majority also excludes from its holding cases “where the cause of injury is unrelated to the symptoms of the disease.” (Maj. opn., ante, at p. 1000.) Patients in the early stages of Alzheimer’s disease ordinarily do not exhibit violent outbursts or have trouble controlling themselves. (See maj. opn., ante, at p. 1006, fns. 3-5 [collecting authorities]; see also Alzheimer’s Association, Seven Stages of Alzheimers <http://www.alz.org/alzheimers_ disease_stages_of_alzheimers.asp> [as of Aug. 4, 2014] [behavioral changes may be noticeable in stage 6].) Accordingly, society should not give such patients a “free pass” to act out by extending primary assumption of risk to them in their dealings with caregivers. Rightfully, the majority does not suggest that injuries caused by anger, fear, or annoyance at a level that we all experience are immunized from liability simply because a patient is in the early stages of Alzheimer’s disease. But determining whether a patient’s injurious conduct is related to the patient’s Alzheimer’s disease requires trial courts to delve into evidence of the stage of illness an Alzheimer’s patient has reached in order to determine whether a patient is no longer responsible for his or her conduct. At some point, primary assumption of risk will apply, but what is that point? Does not that inquiry undermine part of the utility of the doctrine of primary assumption of risk?
For Alzheimer’s patients, I imagine a continuum. For example, in the case of a doctor punched during an in-hospital physical exam by an Alzheimer’s patient, a trial court could apply Herrle and the majority’s decision today to find primary assumption of risk. On the other hand, the opinion suggests a trial court should reject primary assumption of risk when an Alzheimer’s patient living at home gets into a car and injures a stranger by causing a car accident. (Maj. opn., ante, at p. 1004, quoting Herrle, supra, 45 Cal.App.4th at p. 1766.) Where ought nonmedically licensed in-home caregivers like Gregory and patients more competent than Lorraine Cott fit on that continuum? Their relationships are more than that of a stranger in the car accident, but less than a doctor examining a patient in a hospital. But how much more and how much less? And how does a trial court measure the risks attendant to in-home care, compared to, say, performing a physical exam or driving a car? When Lorraine assaulted Gregory, Gregory was engaged in less than providing medical care but in more than socializing. In needing to address these other factors to determine where interactions between caregiver and patient fall on the continuum, a trial court’s analysis begins to look more *1026 like secondary assumption of risk, if not in name, then in substance. And by needing to consider these other factors, the judicial economy of primary assumption of risk disappears.
I posit two situations: In the first, the Alzheimer’s patient is in the early stage of the disease, cantankerous perhaps but not apparently violent, and the family’s comments about disruptive behavior are vague. The caregiver is minimally trained. In the second, the patient has a long history of violence, the caregiver has years of training and experience and is plainly warned of the patient’s past conduct. The majority holds that the second scenario fits squarely within the primary assumption doctrine, but the opinion also suggests that the first scenario does not. I see this dichotomy as a marked departure from the well-established primary assumption of risk rules we have for firefighters, police officers, veterinarians and sports enthusiasts. These contrasting scenarios are more suitable for resolution in the context of secondary assumption of risk, which as the majority observes is adjudicated under the rules of comparative negligence. (Cheong v. Antablin (1997) 16 Cal.4th 1063, 1067-1068 [68 Cal.Rptr.2d 859, 946 P.2d 817]; Knight v. Jewett, supra, 3 Cal.4th at pp. 314-315.)

Workers’ Compensation Insurance

Both the majority opinion and Justice Liu’s concurrence assume that the workers’ compensation system, at least in part, will help mitigate the consequences of subjecting Alzheimer’s caregivers to primary assumption of risk. (Maj. opn., ante, at p. 1015; cone, opn., ante, at p. 1018.) This evidently is true in the present case, as the agency has workers’ compensation coverage that Gregory has been receiving. (Maj. opn., ante, at p. 1000.) But I envision several situations in which a caregiver will not be covered by workers’ compensation, and primary assumption of risk will bar any recovery for injuries of the type Gregory suffered, thus denying the caregiver any remedy for those injuries.
First of all, the agency here apparently has acknowledged Gregory is an employee rather than an independent contractor. Had Gregory been an independent contractor she would not have been entitled to workers’ compensation benefits. (Lab. Code, §§ 3351, 3353, 3600, 3700.) Whether a worker is characterized as an employee or an independent contractor is a frequent subject of litigation both under workers’ compensation law (S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341, 349 [256 Cal.Rptr. 543, 769 P.2d 399] [workers’ compensation laws extend “only to injuries suffered by an ‘employee’ ”]) and with respect to other employee benefits (Ayala v. Antelope Valley Newspapers, Inc. (2014) 59 Cal.4th 522, 530-540 [173 Cal.Rptr. 3d 332, 338-346] [wage and hour protections]). In *1027 light of the “ ‘infinite variety of service arrangements’ ” (Borello, at p. 544), whether any particular home health caregiver is an employee or an independent contractor is not susceptible to categorical determination. Under today’s ruling, the agency-provided home caregiver who is an independent contractor is barred from suing for injuries under the primary assumption of risk, and pursuant to long-established principles he or she is denied workers’ compensation benefits as well.[2]
Situations also are likely to arise in which the caregiver is legally considered an employee but the agency does not have workers’ compensation insurance. Under the Labor Code, if an employer fails to have workers’ compensation coverage, the employee “may bring an action at law against such employer for damages, as if this division did not apply.” (Lab. Code, § 3706; see Valdez v. Himmelfarb (2006) 144 Cal.App.4th 1261, 1268 [51 Cal.Rptr.3d 195].) Under the majority opinion, presumably in those situations a suit against the patient/employer is still barred by primary assumption of risk. Would not the same rule applying primary assumption of risk preclude an action against the agency? And even if the agency could not take advantage of today’s ruling, what would its liability be in such a situation? Unless the agency were in some way negligent, the only viable claim would be against the patient or the family, which is now barred.
As a third example, I observe that the majority limits its holding to those workers “who are trained and employed by an agency,” and expressly disclaims any consideration of “the policy implications of claims by other hired caregivers.” (Maj. opn., ante, at pp. 1008-1009 & fn. 8.) Presumably the disclaimer refers to caregivers who are hired directly by the family and not through a home health care agency. In my view, however, the employing entity is largely irrelevant to today’s analysis. If the independent caregiver is trained to care for Alzheimer’s patients, is warned about the patient’s possible aggressive behavior, and the disease has sufficiently progressed — the criteria for the majority’s application of primary assumption of risk — primary assumption of risk seemingly would bar the independent caregiver from suing the patient or the patient’s family even if the latter is the employer. Just as the majority is unwilling to distinguish the institutional caregiver in Herrle from the present agency-provided home caregiver, I doubt it would be willing to *1028 draw the line between the agency-provided home caregiver and one not hired through an agency. Workers’ compensation benefits might be available if the independent caregiver is considered an employee (and not an independent contractor) and the patient and family have workers’ compensation coverage. But lacking such coverage, even though Labor Code section 3706 grants an employee the right to sue, for the home caregiver that right would be quashed by application of primary assumption of risk.
For these reasons, I do not believe that the potential for workers’ compensation benefits provides doctrinal support for the majority’s extension of primary assumption of risk to a new class of workers.
III. Conclusion
This is a hard case involving sad facts. As the majority notes, the Legislature and society at large may be well served by turning their attention to the problems associated with caring for Alzheimer’s patients. Whatever the solutions to those problems, I do not believe they should be at the expense of in-home caregivers who risk a physical injury by working on the front line, typically for low pay and few benefits. Accordingly, I respectfully dissent.
Werdegar, 1, concurred.

 Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

 In an ideal world, professional health care agencies such as the one that employed Gregory would be involved in determining whether institutional or in-home care is better. As repeat players in the field, such agencies presumably have the expertise needed to make the best decision. And as the caregiver’s employer, the agency is accountable through its workers’ compensation insurance if its decision is incorrect, but the workers’ compensation system involves tradeoffs for both the employee and employer which result in the employee not likely receiving the same amount of compensation that the employee would receive in an ordinary civil action. In that regard, I agree with the majority that matters involving workers’ compensation benefits and other insurance requirements for Alzheimer’s families and their caregivers are questions the Legislature ought to take up, because the remedy the court fashions today — which tries to balance the needs of an injured worker not fully compensated for her injuries against a family struggling with the devastating effects of Alzheimer’s disease — is imperfect at best.

 Whether a home health care worker is an independent contractor rather than an employee presents more than an abstract inquiry. The Employment Agency, Employment Counseling, and Job Listing Services Act (Civ. Code, § 1812.500 et seq.) sets forth the circumstances under which a domestic worker is not an employee of the referring agency for purposes of workers’ compensation laws. (Civ. Code, § 1812.5095, subds. (a), (f).) Compliance with the statute exempts the agency “from state law requirements of maintaining workers’ compensation insurance for the domestic workers.” (An Independent Home Support Service, Inc. v. Superior Court (2006) 145 Cal.App.4th 1418, 1421 [52 Cal.Rptr.3d 562] [provider of caregivers typically for an elderly or infirm member].)